Z–TEL COMMUNICATIONS,
INC. Plaintiff

v.

SBC COMMUNICATIONS, INC, Ameritech Corporation, Pacific Telesis Group, Illinois Bell Telephone Company, Indiana Bell Telephone Company Incorporated, Michigan Bell Telephone Company, Nevada Bell Telephone Company, the Ohio Bell Telephone Company, Pacific Bell Telephone Company, Wisconsin Bell, Inc., and Southwestern Bell Telephone, L.P., Defendants.

No. 5:03 CV 229.

United States District Court,
E.D. Texas,
Texarkana Division.

Aug. 6, 2004.

Nicholas H. Patton, Robert W. Schroeder, III, Patton, Tidwell & Schroeder, Texarkana, TX, Layne E. Kruse, William R. Pakalka, David J. Van Susteren, Darryl W. Anderson, Fulbright & Jaworski, Houston, TX, Christopher V. Goodpastor, Chief Le-

gal Counsel, Z-Tel Communications, Inc., Tampa, FL, for Plaintiff.

Damon Michael Young, John Michael Pickett, Young Pickett & Lee, Texarkana, TX, Aaron M. Panner, Colin S. Stretch, Eugene M. Paige, Mark C. Hansen, Michael K. Kellogg, Neil M. Gorsuch, Kellogg Huber Hansen Todd & Evans, Washington, DC, Martin E. Grambow, William M. Schur, San Antonio, TX, for Defendants.

### *ORDER*

FOLSOM, District Judge.

### TABLE OF CONTENTS: ORDER ON DEFENDANTS' MOTION TO DISMISS

| SECTION | | PAGE |
|---|---|---|
| I. | Introduction | 518 |
| II. | 12(b)(6) Standard | 518 |
| III. | The Telecommunications Act of 1996 | 519 |
| IV. | Overview of Plaintiff's Complaint | 519 |
| V. | Monopolization: Prevalent Legal Standards | 521 |
| VI. | The First Prong of *Grinnell* is Satisfied | 522 |
| VII. | The Intersection of Antitrust Liability and Telecommunications Regulation: Defendant's Most Sweeping Argument for Dismissal | 523 |
| VIII. | Monopolization: Analysis of Plaintiff's Allegations of Exclusionary Conduct Falling Into Categories Not Addressed in *Trinko* | 527 |
| IX. | Monopolization: Refusals to Deal | 535 |
| X. | Essential Facilities | 539 |
| XI. | Attempted Monopolization | 541 |
| XII. | Monopoly Leveraging | 542 |
| XIII. | Tying | 543 |
| XIV. | Subject Matter Jurisdiction and the Breach of Contract Claim | 548 |
| XV. | Subject Matter Jurisdiction and the § 251 Claim | 550 |
| XVI. | Telecommunications Act § 202 | 554 |
| XVII. | Telecommunications Act § 222 | 556 |
| XVIII. | RICO | 557 |
| XIX. | Filed Tariff Doctrine | 563 |
| XX. | Lanham Act | 564 |
| XXI. | Conclusion | 566 |

Before the Court is Defendants' Motion to Dismiss. (Doc. No. 7). A hearing was held on this motion April 8, 2004. After considering the motion and all subsequent briefing thereto, and the applicable law, the Court **grants in part and denies in part.**

Defendants' motion is **GRANTED** as to A) Plaintiff's Essential Facilities claim (Count No. 2), B) Breach of Contract claim (Count No. 11), and C) Telecommunications Act claims (Count Nos. 8, 9, and 10). Plaintiff's Essential Facilities Claim is **DISMISSED with prejudice.** By contrast, Plaintiff's "Breach of Contract" and Telecommunications Act claims are **DIS-MISSED without prejudice to repleading**.

The Court draws special attention to the Tying claim. (Count No. 5). As explained in Part XIII, E.4, *infra,* Defendants' motion is denied as to the Tying claim with a tying market defined as DSL service. Through its use of the disjunctive word "alternatively" Plaintiff's Complaint indicates that an alternative market for broadband internet access need not be considered. So as to avoid any confusion, Plaintiff's Tying claim involving a tying market for broadband internet access is **DISMISSED without prejudice to repleading.**

If Plaintiff chooses to replead any of the claims which are being dismissed without prejudice, it shall do so within thirty (30) days of the entry of this Order.

On all other claims, Defendants' motion is **DENIED**. Defendants urge dismissal of the state law claims if the federal causes of action fail. Not all of the federal causes of action having been found to fail, the state law claims receive no discussion in the Court's analysis.

## I. INTRODUCTION

SBC Communications, Inc. (hereinafter referred to with its subsidiaries as "Defendant" or "Defendants") filed its Motion to Dismiss on November 24, 2003. (Doc. No. 7). Plaintiff filed its Response on January 6, 2004. (Doc. No. 22). On January 13, 2004, the Supreme Court handed down its decision in *Verizon Communications., Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (hereinafter, *"Trinko"*). Justice Scalia delivered the Court's Opinion; Justice Stevens authored a concurrence joined by Justices Souter and Thomas. *Trinko* is a landmark case. In this order, the holding and implications of *Trinko* will be discussed at length. Briefly, the Court said that consumers could not make an antitrust claim against Verizon, the nation's largest regional bell operating company ("RBOC"), because it allegedly violated a requirement to share its network with rivals, as required by the 1996 Telecommunications Act. The linchpin of the *Trinko* opinion was the issue of anticompetitive intent.

There are obvious parallels between the issues the Supreme Court addressed in *Trinko* and the issues presented by the case at bar. Not surprisingly, in the briefs filed after the Supreme Court handed down its opinion, Defendants are emphatic that *Trinko* compels the conclusion that dismissal is warranted. Plaintiff is equally emphatic that *Trinko* bears only a facial similarity to the instant set of facts. At the April 8 hearing, arguments addressing the impact of *Trinko* occupied nearly all of the time allotted to the motion to dismiss.

## II. 12(b)(6) STANDARD

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must take the well-pleaded factual allegations of the complaint as true. "All questions of fact and any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir.2001). "Given the Federal Rules' simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quotation omitted). Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted. *See Southern Christian Leadership Conference v. Supreme Court,* 252 F.3d 781, 786 (5th Cir.2001). "However, 'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Id.* (quoting *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993)).

A plaintiff need not plead its antitrust claims with particularity. *See MCM Partners, Inc. v. Andrews–Bartlett & Assocs.,* 62 F.3d 967, 976 (7th Cir.1995) ("an antitrust plaintiff need not include 'the particulars of [its] claim' to survive a motion to dismiss") (citations omitted). FED. R. CIV. P. 8(a), requiring plaintiff to provide a short and plain statement of its claim showing that it is entitled to relief, "applies with equal force in antitrust cases." *Delaware Health Care, Inc. v. MCD Holding Co.,* 893 F.Supp. 1279, 1284 (D.Del.1995).

The Supreme Court has stated, "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (citations and internal quotations omitted).

## III. THE TELECOMMUNICATIONS ACT OF 1996

To further its local-competition goal, the Telecommunications Act imposes duties on incumbent local exchange carriers ("ILECs") to provide access to their facilities and equipment to competing carriers. 47 U.S.C. § 251. More particularly, in § 251(a) and (b), the 1996 Act imposes on every telecommunications carrier an affirmative duty to interconnect with other carriers, to follow stated rules regarding resale, and to provide nondiscriminatory access to telephone numbers and operator services, telephone poles, ducts, conduits, and rights-of-way. *Id.* § 251(a), (b). Under § 251(c), the incumbent local exchange carrier bears additional duties, including the duty to negotiate interconnection agreements with any new carrier so requesting, to provide access to its network elements on an unbundled basis, to offer its retail telecommunications services for resale at wholesale rates, and to provide for collocation. *Id.* § 251(c).

Section 252 governs negotiation and arbitration of interconnection agreements. *Id.* § 252. Agreements voluntarily made may be entered into without regard to the specific duties imposed by § 251(b) and (c). Section 252 identifies the procedure for agreements reached through mandatory arbitration, which are not exempted from the requirements outlined in § 251. In short, §§ 251 and 252 of the 1996 Act command incumbent local exchange carriers to interconnect with and assist new would-be competitors—obligations that telecommunications carriers did not previously have and would not have had under a free-market regime.

## IV. OVERVIEW OF PLAINTIFF'S COMPLAINT

### A. Plaintiff's Business Model

#### 1. Introduction

Founded in 1998, Z–TEL (hereinafter, "Plaintiff") is a Tampa, Florida based competitive local exchange carrier (hereinafter, "CLEC"). Plaintiff's business model has two main parts.

#### 2. Basic Services

First, Plaintiff is engaged in the business of repackaging and reselling telecommunications services provided by incumbent local exchange carriers ("ILECs"), such as Defendant. To perform this aspect of its business, Plaintiff leases access to the essential portions of Defendant's network. The capital investment in this fixed asset is so immense that it is practically infeasible to duplicate. It naturally and logically follows that access to the network is essential if competition in the market for retail telecommunications services is to ensue. In the Telecommunications Act of 1996, Congress required network sharing with rivals.

At this point some terminology is in order. "Switches" at a central office route incoming calls based on the number dialed, taking the place of telephone operators who manually connected a caller with the recipient of the call. When a call is made to a customer not connected directly to the caller's central office, the call is transported from the caller's central office to the intended recipient's central office. "Transport" refers to the transmission facilities that make this connection possible, including hard assets such as telephone poles, conduits, ducts, and rights of way.

If the central offices are not directly connected by transport, then the call is transported to one or more "tandem switches," which are generally contained in intermediary central offices that join central offices and allow a call to eventually be transported to the intended recipient's central office, where it is then connected to the recipient's local loop. "Operations support systems" are the services and equipment necessary to operate, maintain, and repair switches, transport facilities, and tandem switches.

### 3. Enhanced Services

Second, the seemingly more dynamic aspect of Plaintiff's business consists of its "enhanced services" such as voice mail that may be accessed over the Internet, "find me" call-forwarding, which directs calls to multiple numbers when the first number dialed is not answered, and a unified voice-recognition messaging service that allows subscribers, simply by using their voice, to make calls or retrieve contact information from the email program used on their personal computer. Plaintiff first explains that Defendant does not offer these services. Plaintiff further explains that Defendant is hostile to the provision of enhanced services by others because (unlike the basic services described in Part IV, A.2, *supra*) enhanced services represent a salient marketplace opportunity to earn supra-competitive profits.

### 4. Baseline Complaint

As will be explained immediately below, Plaintiff cannot provide most of these enhanced services without access to Defendant's Advanced Intelligent Network ("AIN"). Plaintiff asserts that access is technologically feasible and can be provided without affecting Defendant's ability to serve its own customers.

### B. Plaintiff's Baseline Complaint

Plaintiff's baseline complaint is that Defendant has denied Plaintiff (and other competitors) access to the AIN. "To compete in the enhanced services market, Z-TEL needs to interconnect its software databases and network with SBC's AIN facilities, including SBC's AIN and signaling databases." (Doc. No. 1, p. 16). In addition, Plaintiff briefly summarizes the following instances of allegedly wrongful conduct. Plaintiff maintains that Defendant has:

1) Completely denied access to and interconnection with essential network facilities that are required to provide customers enhanced services;

2) Completely denied access to and interconnection with essential network facilities that are required to provide customers basic local service;

3) Barred customers who use its DSL internet service from switching to Plaintiff or any other competitor;

4) Refused to allow its essential facilities to be used for the provision of local toll calls, despite express state and federal regulatory orders to do so, thereby requiring Plaintiff to purchase unnecessary additional facilities from long-distance carriers at a cost above that which is economically feasible;

5) Deliberately failed to provide timely information about customers who terminate their service with Plaintiff;

6) Deliberately supplied false bills to Plaintiff for items it has not ordered or received, or at rates expressly rejected by state agencies;

7) Embarked on a malicious public campaign of disparagement, misrepresenting the products and services that Plaintiff and other competitors provide to the public; and

(*Id*, p. 3–4).

8) Abused government processes. (*Id.*, p. 33).

## V. MONOPOLIZATION: PREVALENT LEGAL STANDARDS

### A. *Grinnell's* Two–Pronged Test

■ A monopolization claim has two elements: 1) the possession of monopoly power in the relevant market; and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "Monopoly power is understood as 'the power to control prices or exclude competition,'" *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir.2000) (*quoting United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)), *reh'g denied*, 2000 U.S.App. LEXIS 4258 (5th Cir.2000). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, at 879.

### B. Product Markets and Geographic Markets

The first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power. *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir.2002); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268–69 (2d Cir.1979).

In ascertaining the relevant product market, courts consider the extent to which the seller's product is "interchangeable in use" and the degree of "cross-elasticity of demand between the product itself and substitutes for it." *Apani Southwest, Inc. v. Coca–Cola Enters.*, 300 F.3d 620, 626 (5th Cir.2002); *see also C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir.1985) (*citing Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510(1962)).

■ A geographic market is defined as an "area of effective competition." *Apani*, 300 F.3d at 626 (*citing Jim Walter Corp. v. Federal Trade Com.*, 625 F.2d 676, 682 (5th Cir.1980).) This is the locale in which consumers of a product or service can turn to for alternative sources of supply. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir.1999).

### C. Two Ways of Demonstrating That Defendant Holds Monopoly Power

There are two ways to establish the first element, that is, that the defendant holds monopoly power. The first is by presenting direct evidence "showing the exercise of actual control over prices or the actual exclusion of competitors." *Id.* (*citing Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir.1979)). The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market. *See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196–97 (1st Cir.1996); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995).

### D. Exclusionary Conduct Defined: An Overview

The indeterminate nature and logic of "exclusionary conduct" will be discussed at length in Part VIII, C., *infra*. In this section and the next, the Court offers only a brief overview. Modern monopolization litigation has focused on four types of conduct. The first genre concerns predatory

pricing. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (noting the "general implausibility of predatory pricing"). The second genre concerns product innovation. *See Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76 (2d. Cir.1981) (holding that deliberate efforts to create incompatibility with a rival's products without offering performance enhancements or cost reductions for the monopolist's products might be actionable). The third genre concerns refusals to deal, including denials of access to essential facilities. *See Trinko.* The fourth genre concerns monopoly leveraging. *See Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'") (*quoting Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)).

■ Exclusionary conduct is conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power. *Taylor Publ'g Co. v. Jostens Inc.,* 216 F.3d 465, 475 (5th Cir. 2000). In *Stearns Airport Equip. Co. v. FMC Corp.,* the Fifth Circuit further explained:

> Generally, a finding of exclusionary conduct requires some sign that the monopolist engaged in behavior that—examined without reference to its effects on competitors—is economically irrational. When there is no other possible explanation for an action, there is a strong

inference that it was taken for the purpose of harming competitors rather than otherwise advancing the monopolist's business.

170 F.3d 518, 523 (5th Cir.1999).

In a Sherman Act § 2 case, only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful. *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts' disclosed by the record.").

### E. Anticompetitive Conduct Takes Numerous Forms

" 'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1087 (D.C.Cir.1998) (reversing in part the district court's dismissal of complaint and holding that radio station's claim that defendants made misrepresentations to advertisers and the government in order to protect its monopoly stated § 2 Sherman Act claim). *See also Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 784 (6th Cir.2002) (*quoting Caribbean Broad. Sys.*).

## VI. THE FIRST PRONG OF GRINNELL IS SATISFIED

### A. Plaintiff's Monopolization Claim

Plaintiff's Monopolization claim (Count One) reads as follows:

> SBC has monopoly power in both the basic local and enhanced services markets in each relevant geographic market

and in the entirety of the SBC Region. Among other things, SBC owns and controls the only ubiquitous physical local telecommunications and enhanced services network within the SBC Region. (Doc. No. 1, p. 36, ¶ 97)

SBC has engaged in the anticompetitive conduct described above with the specific intent to maintain and extend its monopoly power and position in the basic local services and enhanced services markets. SBC's conduct has delayed and prevented Z–TEL's entry into these markets in one or more relevant geographic markets. SBC continues to dominate these markets through exclusionary conduct, to the detriment of consumers and competition.

(*Id.*, ¶ 98).

## B. Defendant Possesses Monopoly Power

### 1. Product Market

The relevant product market encompasses the exchange and sale of 1) basic local and 2) enhanced services telephony services.

### 2. Geographic Market

Where products are sold nationwide and transportation costs are insignificant, courts frequently define the geographic market as the entire nation. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 336–37, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("[A]lthough the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area."); *see also Apani Southwest, Inc. v. Coca–Cola Enters.,* 300 F.3d 620, 626 (5th Cir.2002) (*quoting Brown Shoe* ). In the case at bar, the geographic market reaches the full scope of Defendant's service region. This service region includes many major population centers in the United States.

### 3. Defendant Offers No Resistance to Plaintiff's Allegation of Monopoly Power

Defendant's first argument in support of its motion to dismiss is captioned "Z–TEL Has Failed to Allege that Defendants Engaged in Exclusionary Conduct in Violation of Section 2 of the Sherman Act." (Doc. No. 7, p. 8). Since Defendant offers no resistance to Plaintiff's allegation of monopoly power, the Court finds the first element of *Grinnell* satisfied. The viability of Plaintiff's monopolization claim (Count One) therefore depends on the appropriate characterization of the allegedly anticompetitive conduct attributable to Defendant.

## VII. THE INTERSECTION OF ANTITRUST LIABILITY AND TELECOMMUNICATIONS REGULATION: DEFENDANT'S MOST SWEEPING ARGUMENT FOR DISMISSAL

### A. Defendant Attacks the Vitality of Antitrust Liability in This Area of Law

■ As an initial matter, the Court must address an issue at the intersection of antitrust liability and telecommunication regulation. Defendant relies on *Cavalier Tel., LLC v. Verizon Va., Inc.,* 330 F.3d 176 (4th Cir.2003), *pet'n for cert. denied by Cavalier Tel., LLC v. Verizon Va., Inc.,* —— U.S. ——, 124 S.Ct. 1144, 157 L.Ed.2d 1041 (Jan. 20, 2004) and *Goldwasser v. Ameritech Corp.,* 222 F.3d 390 (7th Cir. 2000) for the proposition that antitrust liability is highly circumspect in light of the regulatory framework enacted by Congress in the 1996 Telecommunications Act. (Doc. No. 7, p. 8–10). Defendant maintains that Plaintiff's allegations are "indistinguishable" from those found unavailing as a matter of law in these two cases. ·*Id.* at 8. In addition, on June 28, Defendant submitted a notice of supplemental author-

ity (Doc. No. 155) bringing to the Court's attention a recent opinion from the Eleventh Circuit, *Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir.2004), 2004 U.S.App. LEXIS 12861.

At the hearing, Plaintiff loudly resisted this argument by directing the Court to the 1996 Telecom Act's Savings Clause, Section 601(b)(1): "Nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." (*See also* Doc. No. 22, p. 4).

## B. Defendant's Argument

In its Motion to Dismiss, Defendant declares that all of Plaintiff's § 2 claims fail because Plaintiff fails to sufficiently allege exclusionary conduct.

> [A]llegations like those asserted by Z–TEL fail to state a claim under Section 2 because the antitrust laws do not require firms, including lawful monopolists, to dismantle themselves for the benefit of competitors—which is exactly what Z–TEL demands.

(Doc. No. 7, p. 8).

On the opening page of its Reply, Defendant is emphatic, "*Trinko* definitely bars all of Z–TEL's antitrust claims related to disputes over access to defendants' local telephone networks." (Doc. No. 29, p. 1).

## C. Plaintiff's Argument

In its Sur–Reply, Plaintiff explains:

> Of course, antitrust law has long recognized that a monopolist can violate 'established antitrust standards' in a variety of ways, including the refusal to deal and essential facilities doctrine that the plaintiff relied on in *Trinko*. But here Z–TEL has alleged numerous forms of exclusionary conduct, apart from these two doctrines.

(Doc. No. 37, p. 2).

Plaintiff directs the Court to Exhibit A of its Sur–Reply. Exhibit A is a summary comparison of the factual allegations at issue in *Trinko* and those facts alleged in the case at bar.

## D. *Trinko* Addressed the Scope of its Holding

In *Trinko* 's introductory paragraph, the Supreme Court explained, "In this case we consider whether a complaint alleging breach of the incumbent's duty under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act, 26 Stat 209." 124 S.Ct. at 875. In addition, the Court spoke at length about the antitrust Saving Clause:

> Section 601(b)(1) of the Telecommunications Act of 1996 (1996 Act), Pub.L. No. 104–104, 110 Stat. 56, is an antitrust-specific saving clause providing that nothing in the Act or the amendments made by the Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws. 110 Stat. 143, 47 U.S.C.S. § 152, note. This bars a finding of implied immunity. The saving clause preserves those claims that satisfy established antitrust standards. But just as the 1996 Act preserves claims that satisfy existing antitrust standards, it does not create new claims that go beyond existing antitrust standards; that would be equally inconsistent with the saving clause's mandate that nothing in the Act modify, impair, or supersede the applicability of the antitrust laws.

*Trinko*, at 878 (citations omitted).

## E. Defendant's Reliance on *Goldwasser* Is Misplaced

### 1. The First Section of *Goldwasser* Successfully Anticipated Arguments Found to be Availing in *Trinko*

In *Goldwasser*, a class action, the plaintiff consumers alleged that the defen-

dant, a local telephone service provider, improperly used its monopoly power to engage in exclusionary practices which prevented competitors from entering the market. For analytical purposes, the Court will divide the structure of *Goldwasser* into two (2) sections. In the first part of the opinion, the Seventh Circuit held that, while the plaintiffs had standing to assert their antitrust claims, the plaintiffs failed to allege any wrongful conduct independent of defendant's alleged failure to comply with the requirements of the 1996 Act.

> Only if Section 2 somehow incorporates the more particularized statutory duties the 1996 Act has imposed on ILECs like Ameritech would Ameritech's alleged failure to comply with the 1996 Act be, in itself, also an antitrust violation.

222 F.3d at 396.

It is clear that in the first part of *Goldwasser*, the Seventh Circuit successfully anticipated the arguments which were adopted four years later by the Supreme Court in *Trinko*.

### 2. The Second Section of *Goldwasser* Is Dissonant With the Holding of *Trinko*

In the second part of *Goldwasser*, the Seventh Circuit was clear. "The 1996 Act is, in short, more specific legislation that must take precedence over the general antitrust laws, where the two are covering precisely the same field." 222 F.3d 390, 401 (7th Cir.2000). In *Trinko*, the Supreme Court held to the contrary. "[T]he 1996 Act preserves claims that satisfy existing antitrust standards..." *Trinko*, at 878. Moreover, *Trinko* does not admit to the proposition that the 1996 Act displaces the Sherman Act, even when the two are covering precisely the same field. To the opposite, the principal holding of *Trinko* rests on the Supreme Court's conclusion that Verizon's conduct respecting network access did not usefully speak to its monopolistic aspirations.

The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion. **Here, therefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal— upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice.** The contrast between the cases is heightened by the difference in pricing behavior. In *Aspen Skiing*, the defendant turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher. Verizon's reluctance to interconnect at the cost-based rate of compensation available under § 251(c)(3) tells us nothing about dreams of monopoly.

*Trinko*, at 879–880 (emphasis added) (citations omitted).

In the case at bar, Plaintiff seeks to show that Defendant voluntarily shared its network before the enactment of the 1996 Act. This argument will be more fully addressed in Part IX, D. 2., *infra*. For present purposes, the Court simply notes that, as a matter of logic, if an antitrust plaintiff's contention of voluntary (i.e., prestatutory compulsion) network sharing is substantiated, a viable cause of action may proceed in harmony with *Trinko*. The second part of *Goldwasser* would preclude this possibility.

### F. *Cavalier* is Distinguishable

#### 1. *Cavalier* Anticipated Arguments Later Adopted in *Trinko*

In *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176 (4th Cir.2003), the plaintiff, a competitive local exchange carrier, alleged that the defendant, an incumbent

local exchange carrier, deliberately created problems in the implementation of the interconnection agreement to exclude the plaintiff as a competitor. *Id.* at 179–181 (detailing seven major problematic areas alleged by the plaintiff). The Fourth Circuit determined that the district court properly granted the defendant's motion to dismiss. The Court's reasoning was that the conduct alleged would not, independent of the Telecommunications Act of 1996, violate duties imposed under the Sherman Act.

> Thus, when we focus on the conduct alleged by Cavalier in the complaint before us to determine whether it amounts to breaches of duties imposed for the first time and only by the Telecommunications Act, we conclude that the conduct alleged would not, independent of the Telecommunications Act, violate duties imposed under the Sherman Act.

*Id.* at 190.

In this respect, *Cavalier* perfectly anticipates the arguments adopted by the Supreme Court in *Trinko.* However, for the reasons explained immediately below, *Cavalier* is inapposite to the facts in the case at bar.

### 2. The Plaintiff in *Cavalier* Alleged Only Breaches of Duties That Did Not Exist Prior to the Enactment of the Telecommunications Act of 1996

In *Cavalier,* the court was clear, "Cavalier's complaint alleges only breaches of duties that did not exist prior to the enactment of the Telecommunications Act . . . ." *Id.* The reasoning articulated in the immediately foregoing section concerning *Goldwasser v. Ameritech Corp.* is equally applicable here. The Court will briefly review. If Plaintiff's contention of voluntary (i.e., pre-statutory compulsion) network sharing is substantiated, a viable antitrust claim could stand in harmony with *Trinko. Ca-*

*valier* is in harmony with *Trinko.* However, over a relevant range, *Cavalier* is inapposite to the case at bar since Plaintiff seeks to demonstrate violations of duties which did exist prior to the enactment of the 1996 Act.

### G. *Covad* is Distinguishable

In *Covad Communications Co. v. BellSouth Corp.,* the plaintiffs' claims were grouped into three forms of alleged anticompetitive conduct: refusal to deal, essential facilities, and price squeezing. The refusal to deal claim was dismissed because the relationship between the parties was mandated by the Telecommunications Act; it was not a voluntary agreement between customers. The essential facilities claim was dismissed because access to the telephone provider's infrastructure could be compelled under the Telecommunications Act. However, the price squeezing claim survived because it was based on traditional antitrust doctrine and was not specifically barred by judicial precedent outlining the relationship between the Telecommunications Act and the Sherman Act.

Speaking about the onus placed on ILECs by the 1996 Act, Judge Barkett explained:

> Trinko, however, treats the interconnection agreement between AT & T and Verizon as a mandatory accord between competitors, not a voluntary agreement between customers. *Trinko,* 124 S.Ct. at 880. That Verizon also supplies wholesale unbundled network elements at a cost-based rate to AT & T does not, in the Court's view, make the relationship a non-competitive one. Moreover, Trinko emphasizes the coercive effect of the FTCA on incumbent LECs such as Verizon who—but for the FTCA—would not be required to make their network elements (including OSS) available to

third parties such as AT & T. In short, Covad's refusal-to-deal claims do not survive Trinko and must be dismissed. 374 F.3d 1044, 1049 (11th Cir.2004)2004 U.S.App. LEXIS 12861, *12–13.

Regarding the status of *Aspen*'s refusal to deal doctrine after *Trinko*, Judge Barkett stated, "Trinko now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*." *Id.* at 1049, 2004 U.S.App. LEXIS 12861, *12.

Unlike the plaintiff in *Covad,* Plaintiff in the case at bar adduces evidence that Defendant shared its network before it was legally required to do so. It follows that *Covad* is not perfectly apposite precisely because of this distinction in the pleadings.

### H. Conclusion

As a legal matter, *Trinko* instructs that antitrust liability is live and well in the context of regulated telecommunications. The issue to be decided by this Court is whether or not Plaintiff's complaint sufficiently alleges violations of doctrinally established antitrust standards.

### VIII. MONOPOLIZATION: ANALYSIS OF PLAINTIFF'S ALLEGATIONS OF EXCLUSIONARY CONDUCT FALLING INTO CATEGORIES NOT ADDRESSED IN TRINKO

### A. The Court Does Not Adopt Plaintiff's Nomenclature

#### 1. An Area of Potential Confusion

As an initial matter, the Court will clear up an area of potential confusion.

Plaintiff explains:

Z–Tel's Complaint, therefore, unlike Trinko's, alleges conduct constituting violations of 'established antitrust standards' sufficient to state a claim. It does so under the refusal to deal and essential facilities doctrines that were at issue in *Trinko* and under **general § 2 standard for exclusionary conduct.**

(Doc. No. 37, p. 3) (emphasis added).

#### 2. The Refusal to Deal Legal Theory

The Court declines to adopt Plaintiff's nomenclature. The refusal to deal legal theory will be addressed at length in Part IX, *infra.* However, for present purposes, the Court notes that this theory is hardly novel. In *United States v. Colgate & Co.,* the Supreme Court stated the basic rule that "[i]n the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

#### 3. The Essential Facilities Legal Theory

Essential facilities will be addressed at length in Part X, *infra.* For present purposes, the Court simply notes that essential facilities is also not a novel legal theory. The former chairman of the Federal Trade Commission, Professor Pitofsky, explains, "[t]he essential facilities doctrine has a long and respected history as part of U.S. antitrust law." Robert Pitofsky, et al., *The Essential Facilities Doctrine Under U.S. Antitrust Law,* 70 ANTITRUST L.J. 443, 445 (2002).

Essential facilities is a species of refusal to deal. As Professor Hovenkamp explains, the two are close cousins:

But the defendant's duty to deal in the essential facility cases appears to have about the same scope as the defendant's duty to deal in the *Aspen* case, where the Court did not rely on the essential facility doctrine.

HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE 307 (2d ed.1999) (hereinafter, "HOVENKAMP").

In Parts IX and X, *infra*, the Court will devote considerable attention to *Trinko* and its impact on the doctrines of 1) refusals to deal and 2) essential facilities. However, in its analysis, the Court does not elevate these two types of exclusionary conduct above the level of importance assigned to those types of exclusionary conduct Plaintiff refers to as "general." The discussion immediately below is devoted to an analysis of Plaintiff's allegations of exclusionary conduct falling into certain categories not addressed in *Trinko*. The distinction is simply for purposes of methodological convenience.

## B. Plaintiff Alleges Four Clusters of Exclusionary Conduct

### 1. Product Disparagement Through Public Advertising

█ Plaintiff's allegations concerning defamation and disparagement are contained in paragraphs 89–91. (Doc. No. 1, p. 34). The crux of these allegations are that Defendant refers to itself "as a real phone company" while mockingly referring to Plaintiff in public advertising as a "flashy" imposter.

### 2. Abuse of Government Processes

Plaintiff's abuse of government process allegations are contained in paragraphs 85–88 of the Complaint. (Doc. No. 1, p. 33–34). The gestalt of these allegations is that Defendant seeks to force competitors to expend time and resources contesting Defendant's noncompliance with the orders of state utility commissions. Plaintiff claims that this conduct is not shielded by *Noerr–Pennington*. *Id*. at p. 34.

### 3. Provision of Faulty Line Loss Information

Plaintiff's allegations concerning the provision of faulty "line loss" information are presented in paragraphs 70–78 of its Complaint. (Doc. No. 1, p. 27–29). Plain-tiff relies on Defendant's operational support systems to inform it when one of Plaintiff's customers switches service providers. Plaintiff alleges, "Customer records were mislabeled at rates in excess of 60% in some months and were not timely delivered under SBC's own standards at rates approaching 90% in several months." *Id*. at p. 28. "Between December 2000 and February 2002, Z–TEL complained to SBC about problems with the line loss notification more than 75 times." *Id*. Plaintiff quotes a Bank of America Securities report for the proposition that this conduct reflects a deliberate strategy on Defendant's part to increase the "churn rate" of its rivals. *Id*. at p. 27.

### 4. Allegations of 1) Increased Costs and 2) Harm to Reputation Through Defendant's Submission of False Bills

Plaintiff's allegations concerning Defendant's habitual refusal to provide 1) accurate billing for the leased network facilities and 2) call records are contained in paragraphs 79–84 of the Complaint. (Doc. No. 1, p. 30–32). "As a result, Z–TEL had literally hundreds of billing disputes with SBC and was forced to expend undue resources on deciphering SBC's bills." *Id*. at p. 30. Plaintiff quotes one of Defendant's former employees who states that he was instructed to prepare false bills. *Id*. at p. 32.

## C. Analysis

### 1. The Second Prong of *Grinnell*: the Indeterminate Nature and Logic of Exclusionary Conduct

### a. The Supreme Court Has Recognized the Difficulty in Differentiating 1) Robust Competition from 2) Conduct With Long–Term Anticompetitive Effects

On at least two occasions, the Supreme Court has acknowledged the "difficulty"

manifest in its exclusionary conduct doctrine.

In *Copperweld Corp. v. Independence Tube Corp.*, the Court stated:

> In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.

467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

In *Spectrum Sports v. McQuillan*, the Court further explained:

> [T]his Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it. It is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects; moreover, single-firm activity is unlike concerted activity covered by § 1, which 'inherently is fraught with anticompetitive risk.'

506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (*citing Copperweld*).

### b. The *Aspen* Formulation

In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, the Supreme Court defined exclusionary conduct as that which 1) tends to impair the opportunities of rivals, but also 2) either does not further meritorious competition or does so in an unnecessarily restrictive way. 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (quoting III PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 78 (1978)).

### c. The *Kodak* Formulation

In *Eastman Kodak Co. v. Image Technical Servs.*, the Supreme Court articulated a somewhat different formulation of exclusionary conduct. "The second element of a § 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" 504 U.S. 451, 482–83, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (*quoting United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)).

### d. The 'Business Purpose' Formulation

Another genre of formulations stresses that a firm does not engage in monopolization if its conduct is motivated by "valid business reasons," a "normal business purpose," or "legitimate competitive reasons." *See Kodak*, 504 U.S. 451, 483, 112 S.Ct. 2072 ("Liability turns, then, on whether 'valid business reasons' can explain Kodak's actions."); *Id.* at n. 32, 112 S.Ct. 2072 ("It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal."); *Aspen*, 472 U.S., at 608, 105 S.Ct. 2847 ("[Defendant] did not persuade the jury that its conduct was justified by any normal business purpose.").

### e. Fifth Circuit Doctrine

As mentioned in Part V. D., *supra*, the two hallmark Fifth Circuit cases defining exclusionary conduct are *Taylor Publ'g Co. v. Jostens Inc.*, 216 F.3d 465 (5th Cir.2000) and *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir.1999). In *Taylor*, the court spoke in greater detail than it did in *Stearns Airport*.

> 'Exclusionary' conduct is conduct, other than competition on the merits or restraints reasonably 'necessary' to com-

petition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.

Exclusionary comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.

To determine whether conduct is exclusionary, we look to the proffered business justification for the act.

216 F.3d, at 475 (citations omitted).

## 2. Product Disparagement

### a. Defendant's Argument

Z–Tel's claims of 'defamation and disparagement' (Compl.¶ 89–91) similarly fails to identify conduct that could form the basis for a claim under Section 2. In fact, any such misrepresentations are 'presumptively de minimis' absent 'cumulative proof that the representations were clearly false, clearly material, clearly likely to induce reasonable reliance, made to buyers without knowledge of the subject matter, continued for prolonged periods, and not readily susceptible to neutralization or other offset by rivals.' Z–TEL stumbles at the very first hurdleit has failed even to identify an allegation that can be called false. (Doc. No. 7, p. 16) (citations omitted).

### b. Advertising That Creates Barriers to Entry May Constitute Exclusionary Conduct

In *Berkey Photo, Inc. v. Eastman Kodak Co.*, the court stated, "A monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted by competitive exigencies as to constitute an entry barrier." 603 F.2d 263, 287 (2d Cir.1979) (*citing American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). In *Phototron Corp. v. Eastman Kodak Co.*,

the Fifth Circuit extrapolated this exact portion of the *Berkey* holding in reaching the conclusion that, "[a]dvertising that creates barriers to entry in a market constitutes predatory behavior of the type the antitrust laws are designed to prevent." 842 F.2d 95, 100 (5th Cir.1988). Immediately thereafter, the court qualified this statement: "[w]ithout evidence of how advertising in the whole-sale photofinishing industry can act as a barrier to Phototron's participation in the industry, we cannot conclude that Phototron is likely to succeed on this theory of predation." *Id.* at 101.

### c. A Presumption That The Effect on Competition Through Advertising is *de Minimis*

#### i. Introduction

Several opinions ruling on motions for summary judgment frame the legal landscape. Obviously, this Court is not presently considering a motion for summary judgment. However, the following set of cases are overviewed for their doctrinal principles.

#### ii. Hallmark Cases From the Second, Sixth, and Ninth Circuits

In *National Assoc. of Pharmaceutical Mfrs., Inc. v. Ayerst Labs.*, the Second Circuit held that "[a] plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was *de minimis*." 850 F.2d 904, 916 (2d Cir.2003) (citing *Berkey*, 603 F.2d, at 288 n. 41). In *Berkey*, the court held as follows with regard to advertising:

[I]n its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible. Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least

unless it amounts to deception, constitute anticompetitive conduct violative of § 2.

*Id.* at 287–88 (footnote omitted).

In *American Professional Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,* the Ninth Circuit also adopted a *de minimus* presumption and laid out a six-part test that a plaintiff must satisfy to rebut the presumption: the statements at issue must be (1) clearly false; (2) clearly material; (3) clearly likely to induce unreasonable reliance; (4) made to unsophisticated parties; (5) continued for long periods; and (6) not readily cured by rivals. 108 F.3d 1147, 1152 (9th Cir.1997).[1] In *American Professional,* the court was clear that all of these factors must be met for the case to survive summary judgment. In *Ayerst,* the Second Circuit also discussed this test favorably, but it is unclear whether the court thought each requirement was mandatory. 850 F.2d 904, 916–17 (2d Cir.1988).

In *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Board of Podiatric Surgery, Inc.,* the Sixth Circuit rejected the claim of the plaintiff, a podiatrists' certification association, that the defendant's alleged false advertising could support a claim under Section 2. 323 F.3d 366, 369 (6th Cir.2003). The court noted that to survive summary judgment on the second prong of a monopolization claim premised primarily on allegedly false speech or advertising, the plaintiff is required to rebut a presumption that the impact on competition was *de minimis,* by showing two additional facts: "(1) the advertising was clearly false, and (2) it would be difficult or costly for the plaintiff to counter the false advertising." *Id.* at 371. Concluding that the plaintiff had failed to meet either showing, the court affirmed

the grant of summary judgment to the defendant. *Id.* at 372.

### iii. *Aldridge v. Microsoft*

In *David L. Aldridge Co. v. Microsoft Corp.,* Judge Lake was presented with a motion for summary judgment. 995 F.Supp. 728 (S.D.Tex.1998) ( Lake, J.). The product disparagement claim trained on messages found in the Microsoft Windows "help box." Relying heavily on *American Professional, Berkey,* and *Ayerst,* Judge Lake granted defendant's motion as to the product disparagement claim since the plaintiff failed to show that "any of the four messages continued for extended periods or that they were not readily susceptible to explanation or neutralization . . . ." *Id.* at 751.

### d. Organized Deception By A Dominant Firm May Have Anticompetitive Conduct Implications When Used Against A Nascent Firm

Professors Areeda and Hovenkamp explain:

> [M]isrepresentations and organized deception by a dominant firm may have § 2 implications when used against a nascent firm just as it is entering the market. Such a firm has no established customer base and typically lacks the resources to answer the dominant firm's deception effectively. Of course, even honest advertising by a dominant firm can deter new entrants, but we virtually always consider honest advertising as competition on the merits.

IIIA AREEDA AND HOVENKAMP, ANTITRUST LAW, § 782a.

---

1. This test was first suggested in 3 PHILLIP AREEDA & DAVID TURNER, ANTITRUST LAW P 738a, at 278–79 (1978).

#### e. Plaintiff Fits Areeda and Hovenkamp's Description of "A Nascent Firm"

The analysis offered by Professors Areeda and Hovenkamp in the immediately preceding section is an especially good fit to describe Plaintiff's market situation. In *Phototron Corp. v. Eastman Kodak Co.*, the Fifth Circuit was clear that advertising creating barriers to entry in a market constitutes exclusionary conduct. 842 F.2d 95, 100 (5th Cir.1988). On a motion to dismiss, the Court is required to view all allegations in the light most favorable to the non-movant. At this point, the Court cannot say that Plaintiff's product disparagement claim involving false advertising fails as a matter of law.

### 3. Abuse of Government Processes

#### a. Defendant's Argument

Z–Tel concedes that such litigation efforts were directed at reducing Defendant's regulatory burdens under the 1996 Act (specifically Defendants' obligation to provide 'shared transport,' *see* Compl. ¶ 85). And because Defendants have no antitrust duty to unbundle their networks for the benefit of competitors, it violates no duty by attempting to forestall the imposition of such regulatory obligations.

(Doc. No. 7, p. 16).

#### b. *Noerr–Pennington*

#### i. Overview of the Doctrine

■ *Noerr–Pennington* immunity does not stem solely from the First Amendment; rather, it is inextricably associated with interpretations of the Sherman Act. *See Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358 (5th Cir.1983).

The *Noerr–Pennington* doctrine confers immunity to private individuals seeking anticompetitive action from the government. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365

U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *See also California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (extending *Noerr–Pennington* protection to petitioning activities aimed at state and federal agencies and courts); *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (granting *Noerr–Pennington* immunity for efforts to influence local governments). *Noerr–Pennington* immunity applies to any concerted effort to sway public officials regardless of the private citizen's intent. *See Pennington*, 381 U.S. at 670, 85 S.Ct. 1585.

#### ii. Defendant Fails to Raise this Argument

Plaintiff declares, "[t]his pattern of abusive conduct falls outside any petitioning privilege under the *Noerr–Pennington* doctrine." However, Defendant's Motion to Dismiss does not raise the *Noerr–Pennington* affirmative defense. Accordingly, the Court will not address it.

#### c. An Increasingly Dangerous Threat to Competition

Judge Bork has stated, "[p]redation by abuse of governmental procedures, including administrative and judicial processes, presents an increasingly dangerous threat to competition." ROBERT H. BORK, THE ANTITRUST PARADOX 347(1993).

#### d. Defendant's Argument Is Misplaced

First, Defendant claims that it has no antitrust duty to unbundle its network for the benefit of its competitors. Putting aside for the moment Plaintiff's essential facilities claim, there is no doubt that un-

der § 251(c) of the 1996 Act, the incumbent local exchange carrier bears, *inter alia*, the duty to negotiate interconnection agreements with any new carrier so requesting, to provide access to its network elements on an unbundled basis, to offer its retail telecommunications services for resale at wholesale rates, and to provide for collocation.

Second, even if Defendant is correct that no antitrust liability may attach for failing to allow interconnection, it is an entirely different matter if Defendant has "initiated and maintained baseless regulatory proceedings" relating to its 1996 Act duties. (Doc. No. 1, p. 34). *Trinko* was clear: the simple fact that one has duties under the 1996 Act does not confer a grant of antitrust immunity relating thereto.

### e. Defendant Does Not Prevail on this Point

The Court does not accept Defendant's assertion that Plaintiff's allegations concerning the initiation of baseless regulatory proceedings fail as a matter of law.

### 4. Line Loss Information

### a. Defendant's Argument

Z–TEL complains that it lacks accurate line-loss information, but such information relates only to customers that Z–TEL has *already* lost (through no alleged fault of Defendants); Z–TEL does not explain how tardy access to such information affects competition. (Doc. No. 7, p. 15) (italics in original).

### b. Defendant's Misstates Plaintiff's Complaint

In contrast to Defendant's characterization, Plaintiff explains in some detail how competition is allegedly harmed by Defendant's conduct concerning the provision of faulty line loss information.

First, accurate and timely information on disconnections by customers is necessary for Z–Tel to audit the charges of SBC for the essential facilities that Z–TEL leases because many of these charges are measured on a per-customer basis. Such audits are necessary to ensure that SBC does not charge Z–TEL for facilities used to serve customers who are no longer Z–TEL customers. A second negative consequence to Z–Tel of erroneous and untimely provision of line loss notification relates to customers complaints.

Such complaints cause Z–Tel to incur costs in responding to these complaints and damage Z–Tel's reputation with former, present, and prospective customers.

(Doc. No. 1, p. 28).

### c. Reputation is A Capital Asset

Reputation is a very real capital asset to a business firm. RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 230 (1998) ("[R]eputation is a basis for inducing others to engage in market or nonmarket transactions with you.").

The crux of this allegation is that Defendant has harmed Plaintiff's reputation in the marketplace. The Court cannot say that, as a matter of law, Plaintiff's allegation of this sort of activity fails to come within the ambit of exclusionary conduct, as that term was defined in Part VIII, C.1, *supra*.

### 5. False Billing

### a. Defendant's Argument

Z–Tel's claim that Defendant's bills are inaccurate (*see* Compl. ¶¶ 79–84) is unconnected to any alleged effect on competition. *See also Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1355 (5th Cir.1980) ("[T]he concept of 'exclusionary' practice would become totally unmanageable unless the judges are willing... to ignore those

practices that seem unlikely to have made a substantial impact upon the achievement, maintenance, or expansion of monopoly power.").

(Doc. No. 7, p. 16).

#### b. Defendant's Argument is Conclusory

Plaintiff complains, "Z–TEL had literally hundreds of billing disputes with SBC and was forced to expend undue resources on deciphering SBC's bills." (Doc. No. 1, p. 30). Viewed in isolation, Plaintiff's allegation of false billing might not predicate a monopolization claim. However, as explained more fully in Part VIII D., *infra*, in *Continental Ore*, the Supreme Court instructed that courts should not tightly compartmentalize the varied factual components of an antitrust case. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The gestalt of Plaintiff's story is that Defendant undertook a concerted scheme of conduct to disrupt Plaintiff's viability as a competitor. Viewed in combination with Plaintiff's other allegations, the allegation of false billing does not fail to state a claim as a matter of law.

#### D. Aggregation of Separate Instances of Allegedly Exclusionary Conduct

##### 1. *Continental Ore*

■ Plaintiff cites *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) for the proposition that the law rejects a tight compartmentalization of the varied factual components of an antitrust case. (Doc. No. 37, p. 8). Professor Hovenkamp advises, "[t]he Supreme Court's *Continental Ore* language that proof should not be tightly compartmentalized has been cited numerous times by antitrust plaintiffs, sometime properly, sometime improperly." II AREEDA AND HOVENKAMP, ANTITRUST LAW, § 310c, p. 140–41. In the discussion immediately below, the

Court will explain why it aligns with the former rather than the latter.

##### 2. The Broader Context: Claims of Insufficient Evidence

This Court first addresses the legal principles which control in the broader context of the adjudication of claims of insufficient evidence. In this context, aggregation is proper when the violation "requires that a certain threshold be met and no claim standing alone is sufficient to meet the threshold." *Id.* at 141. Aggregation is improper when cardinality is lacking or a plaintiff fails to prove an element essential to every claim. *Id.*

##### 3. The Narrower Context: Exclusionary Conduct

This Court now turns to the prevalent legal principles governing aggregation of conduct in the narrower context of exclusionary conduct. Professor Hovenkamp explains:

> In a monopolization case conduct must always be analyzed 'as a whole.' A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as *de minimis* or an error in judgment, but the pattern gives increased plausibility to the claim. For example, a monopolist might accidentally file a single baseless infringement suit, but a pattern of such suits indicates wilfulness.

*Id.* at 147.

In *United States v. Microsoft*, the Court concluded that several monopolistic acts considered *individually* violated Section 2. In addition,

> Microsoft's campaign to protect the applications barrier from erosion by network-centric middleware can be broken down into discrete categories of activity,

several of which on their own independently satisfy the second element of a § 2 monopoly maintenance claim. But only when the separate categories of conduct are viewed, as they should be, as a single, well-coordinated course of action does the full extent of the violence that Microsoft has done to the competitive process reveal itself.

87 F.Supp.2d 30, 33 (D.D.C.2000) (*citing Continental Ore*) (*rev'd on other grounds by United States v. Microsoft Corp.*, 253 F.3d 34, 346 U.S.App. D.C. 330 (D.C.Cir. 2001)).

### 4. Conclusion: Plaintiff Alleges a Patterned Course of Action Which the Court Views in the Aggregate

The Court views Plaintiff's allegations of the provision of 1) product disparagement, 2) abuse of government processes, 3) provision of faulty line loss information, and 4) false billing as a patterned course of action. Viewed as a whole, these allegations negate Defendant's contention that Plaintiff's Monopolization claim fails as a matter of law. The Court hastens to add that it passes no judgment on the ultimate validity of these accusations. Defendant is free to question the weight and credibility of the evidence offered in support thereof in a future motion for summary judgment.

### E. Conclusion: Plaintiff's Monopolization Claim Concerning Conduct Not at Issue in *Trinko* Survives the Motion to Dismiss

Defendant's Motion to Dismiss Plaintiff's Monopolization claim (Count No. 1) is **DENIED** with respect to Plaintiff's allegations of 1) product disparagement, 2) abuse of government processes, 3) provision of faulty line loss information, and 4) false billing.

## IX. MONOPOLIZATION: REFUSALS TO DEAL

### A. General Legal Principles

#### 1. The Freedom To Organize Business Affairs is Limited By Monopolistic Aspirations

█ In *United States v. Colgate & Co.*, the Supreme Court stated the basic rule that "[i]n the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *see also Reeves, Inc. v. Stake*, 447 U.S. 429, 439, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (*citing Colgate*).

Judge Bork has succinctly stated the baseline rule regarding individual refusals to deal:

> Present law leaves the individual firm free to refuse to deal with others, unless the refusal is intended to support another illegal restraint or constitutes an attempt to monopolize.

ROBERT H. BORK, THE ANTITRUST PARADOX 344 (1993).

#### 2. *Aspen Skiing*

#### a. The Fundamental Holding of *Aspen*

The hallmark case in the doctrine of unilateral refusals to deal is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Professors Areeda and Hovenkamp summarize the holding of this case:

> In sum, although no general nor absolute duty was imposed on a monopolist to deal with or cooperate with actual or would-be competitors, any of its actions might be condemned if the jury finds

that the monopolist 'willfully' acquired, maintained, or used monopoly power 'by anticompetitive or exclusionary means *or* for anticompetitive or exclusionary purposes.' Such means or purposes were contrasted with 'valid' or 'legitimate business reasons.' **The Court's logic was apparently that legitimate business reasons prevent the characterization of the defendant's behavior or purpose as anticompetitive or exclusionary.**

IIIA Areeda & Hovenkamp, Antitrust Law 186 (2d ed.) (1998) (emphasis added).

### b. Criticism of *Aspen Skiing*

*Aspen* has been the subject of much scholarly criticism. Professor Hovenkamp explains, "[t]he difficult question for those supporting *Aspen* is finding a way of applying its principle, without losing control of it." Hovenkamp 295. Professor Graglia makes the point, "[o]ne may be generally skeptical of the validity of a rule that makes it illegal to terminate what one is not legally required to begin." Lino A. Graglia, *The Burger Court and Economic Rights*, 33 Tulsa L.J. 41, 62 (1997).

In *Trinko,* the Court explained, "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko,* at 879 (2004). The bottom line is that criticism notwithstanding, the Supreme Court reaffirmed that *Aspen Skiing*'s holding about unilateral refusals to deal is good law.

### B. Defendant's Refusal to Deal Argument Trains on Voluntary Engagement

Discussing *Trinko*'s treatment of *Aspen Skiing,* Defendant explains:

[T]he defendant in *Aspen* had 'voluntarily engaged in a [prior] course of dealing with rivals' and refused to provide the precise 'product that it *already sold at retail*' to its rival at full retail price. By contrast here, defendants do not voluntarily provide DSL service on a stand-

alone basis and have not set a retail price for providing DSL service over lines controlled by CLEC's (whose permission they must obtain before offering the service). Mandating such an arrangement would require 'considerable expense and effort' including designing and implementing '[n]ew systems' for ordering, provisioning, billing, and maintenance- to accommodate Z–TEL's demand. *Id. Trinko* makes clear that antitrust law imposes no such duty.

(Doc. No. 29, p. 5).

### C. Plaintiff's Response

Plaintiff reads *Trinko* as establishing two circumstances which must exist in order for a refusal to deal claim to be properly made out:

Interpreting *Aspen, Trinko* identified two circumstances that shed light and thus are sufficient to state a refusal to deal claim: (1) when the defendant's prior conduct involved voluntary provision of the product ('voluntariness') and (2) when the defendant has made the product available to non-competitors, but not competitors ('discrimination').

(Doc. No. 37, p. 4) (*citing Trinko,* p. 879–80).

### D. Analysis

### 1. In *Trinko,* Plaintiff's "Discrimination" Terminology is Not Stated As Such

Defendant's "voluntariness" argument is well taken. Discussing *Aspen,* the *Trinko* Court wrote, "[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko,* at 880.

However, the Supreme Court did use the term "discrimination" in the sense Plaintiff uses the word at present:

In *Otter Tail Power Co. v. United States*[, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)], the defendant was already in the business of providing a service to certain customers (power transmission over its network), and refused to provide the same service to certain other customers. In the present case, by contrast, the services allegedly withheld are not otherwise marketed or available to the public.

*Trinko*, at 880 (citations omitted).

In other words, Plaintiff is correct that *Trinko* addressed the concept of "discrimination" in the context of a refusal to deal with one set of customers versus a different set of customers. But the Supreme Court did not use the word "discrimination." To avoid any confusion, this Court clarifies that it interprets Plaintiff's use of the word "discrimination" to refer to the portion of *Trinko* quoted immediately above.

## 2. Evidence That Defendant Voluntarily Shared its Network Before the Enactment of the 1996 Act

Plaintiff brings forth some evidence that, prior to the enactment of the 1996 Act, Defendant voluntarily offered to share its network. (Doc. No. 37, p. 4–6). Viewed in an unfavorable light to Plaintiff, this "voluntary" sharing was driven less by the profit motive than it was driven by a desire to satisfy regulators looking at the proposed merger of SBC and Ameritech. However, on a motion to dismiss, a district court must view all allegations in the light most favorable to the non-movant. Viewed in the most favorable light, this Court cannot say that Plaintiff has failed to allege that Defendant has ceased a profitable business practice in which it voluntarily engaged prior to onset of statutory compulsion.

## 3. Evidence That Defendant Discriminatorily Offers Access at Present

Plaintiff asserts that Defendant offers access to local service providers in areas Defendant does not serve. Particularly, Plaintiff alleges that Defendant offers access to Valor Telecom, the local service provider in Texarkana. (Doc. No. 37, p. 6). Plaintiff also alleges that Defendant allows its non-competitor, Intrado, interconnection for purposes of 911 emergency calls. Viewed in the light most favorable to the non-movant, the Court cannot conclude that Plaintiff has failed to allege a discriminatory business practice, as that term was addressed by the Supreme Court in *Trinko* and *Otter Tail.*

### 4. *Stein v. Pacific Bell*

#### a. Introduction

On March 23, 2004, Defendant filed a Notice of Supplemental Authority bringing to the Court's attention an unpublished order from the Northern District of California, *Stein v. Pacific Bell.* In *Stein*, Judge Illston granted the defendant's motion for summary judgment as to plaintiff's refusal to deal, essential facilities, and monopoly leveraging claims. Defendant first notes that Judge Illston ruled on a motion for summary judgment. By contrast, this Court is obviously presented with a motion to dismiss. Defendant maintains that this distinction is immaterial because Judge Illston reached her conclusion without reaching the issue of evidentiary sufficiency.

Second, Defendant is emphatic that *Stein* and the case at bar are strongly correlative. For the reasons explained immediately below, the Court disagrees.

#### b. Differently Situated Plaintiffs

In *Stein*, the plaintiff brought suit on behalf of himself and others similarly situated consumers of DSL service. In the

opening paragraph, Judge Illston explained, "Stein claims that this anticompetitive conduct has denied consumers a competitive choice in DSL service providers." *Stein,* p. 2. In the case at bar, Plaintiff does not claim to be a consumer in the conventional sense. Defendant's own legal posture illustrates this point; the gestalt of Defendant's refusal to deal argument is that it conducts business with Plaintiff only because of the telecommunications laws' fiat.

### c. The Fundamental Holding of *Stein*

As explained in Part IX, D. 2 and 3, *supra,* Plaintiff's core argument that its refusal to deal claims fits within the *Aspen Skiing* exception (re-enunciated in *Trinko* ) is that Defendant shared its network before it was statutorily required to do so. In *Stein,* the analogous voluntary behavior was described as follows: "defendants in the instant case voluntarily agreed to provide competitors with loop qualification information." *Stein,* p. 10. Judge Illston found the plaintiff's argument to be availing for the following reason: "This Court disagrees, but also finds that defendants were statutorily obligated to provide the loop qualification information under § 251(c)(3) of the Telecommunications Act." *Id.* p. 10–11. Therefore, the fundamental holding of *Stein* is that the plaintiff made allegations analytically identical to those made by the plaintiff in *Trinko,* insofar as those allegations concerned a failure to perform a duty only recently prescribed by law.

### d. The *Stein* Court's Commentary in Dicta is Highly Distinguishable From the Allegations in the Case at Bar

Even assuming *arguendo* that defendants voluntarily obligated themselves to provide competitors with loop qualification information, this case does not fit within the very narrow confines of the refusal to deal doctrine . . .

*Stein,* p. 13.

In *Aspen Skiing,* the formerly dominant partner terminated the joint venture, whereas in the case at hand, defendants simply failed to comply exactly with the requirements of a regulatory scheme. *Id.* p. 14.

This Court first notes that Judge Illston's "arguendo" analysis follows her statement of *Stein* 's fundamental holding. Nevertheless, the portion of her order quoted immediately above conclusively demonstrates that the plaintiff in *Stein* rested its argument on the failure to comport with recently enacted regulatory duties. By contrast, in the case at bar, Plaintiff alleges termination of a voluntary course of dealing undertaken before the imposition of statutory compulsion.

### e. Conclusion

This Court agrees with Judge Illston (and the academic commentary overviewed in Part IX, A.2. b, *supra* ) that the exception in *Aspen Skiing* is a narrow one. To be sure, Plaintiff must perform a difficult doctrinal task. However, unlike the allegations in *Stein,* Plaintiff has alleged that Defendant discontinued a voluntary course of dealing which it initiated free from any legal responsibility to commence.

### 5. Defendant Belatedly Raises an Argument Which Misreads *Trinko*

### a. The Belated Argument

On July 21, 2004, Defendant filed a Reply to Z–Tel's Response to Defendants' Notice of Supplemental Authority. (Doc. No. 177). Speaking about Plaintiff's allegations of pre-compulsory network sharing, Defendant stated:

*Trinko* expressly held that 'the other boundary of § 2 liability' under *Aspen*

*Skiing* requires proof that the defendant terminated a preexisting voluntary business arrangement *with the plaintiff* (not other companies)...

*Id.* at p. 2–3 (italics in original).

This Court first notes that this argument was not raised in the original motion to dismiss. That motion relied almost exclusively on *Goldwasser* and *Cavalier.* (Doc. No. 7, p. 8–11). Nor was this argument raised in Defendant's post-*Trinko* reply. (Doc. No. 29, p. 1–2).

It is a basic tenet of civil procedure that reply briefing may only respond to the allegations raised in the nonmovant's response. *See Hartley v. Wisconsin Bell,* 930 F.Supp. 349, 352 (E.D.Wis.1996); *see also Graning v. Sherburne Cty.,* 172 F.3d 611, 614 n. 2 (8th Cir.1999) ("[A]ffidavits may appropriately be produced with a reply brief when they respond to new issues which have arisen during briefing.") (emphasis added). A defendant certainly cannot raise an argument for the first time on a response to notice of supplemental briefing. To hold otherwise would countenance litigation by ambush. The discussion which follows immediately below is offered only by way of commentary.

**b. Defendant Misreads *Trinko***

In Defendant's belatedly raised argument, the words "with the plaintiff" are not in quotations marks. Defendant cites to pages 879–80 of the *Trinko* opinion. It is of vital importance to this Court's analysis that the text on those two pages do not support Defendant's contention that a cessation of voluntary business activity must have been with a § 2 plaintiff in order to satisfy the standard of *Aspen Skiing.*

For example, "The leading case for § 2 liability based on refusal to cooperate with a **rival,** and the case upon which respondent understandably places greatest reliance, is *Aspen Skiing.*" *Id.* at 879 (emphasis added). The complaint does not

allege that Verizon voluntarily engaged in a course of dealing with its **rivals,** or would ever have done so absent statutory compulsion. *Id.* at 880 (emphasis added). "We conclude that Verizon's alleged insufficient assistance in the provision of service to **rivals** is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id.* (emphasis added).

The bottom line is that the Supreme Court's repeated use of the generic terms "rival" in both the singular and the plural negatives Defendant's contention that only termination of a cooperative venture with a § 2 plaintiff, rather than other market participants, suffices.

**E. Conclusion**

Plaintiff bears a heavy doctrinal burden to capture *Aspen Skiing*'s narrow exception. However, because Plaintiff avers to pre-compulsory sharing of the network constituting a cooperative venture with rivals, the Court cannot conclude that Plaintiff has alleged no set of facts which would come within the ambit of that exception. Accordingly, Defendant's Motion to Dismiss Plaintiff's Monopolization claim (Count No. 1) is **DENIED** with respect to Plaintiff's refusal to deal allegation.

As the Court concluded in Part VIII. E., *supra,* Defendant's Motion to Dismiss Plaintiff's Monopolization claim (Count No. 1) was denied with respect to Plaintiff's allegations of exclusionary conduct not at issue in *Trinko.* For these reasons, Defendant's Motion to Dismiss Plaintiff's Monopolization claim (Count No. 1) is **DENIED** in its entirety.

**X. ESSENTIAL FACILITIES**

**A. General Legal Principles**

**1. Essential Facilities is A Species of the Refusal to Deal Legal Theory**

Essential facilities refers to a particular embodiment of the refusal to deal

legal theory. Professor Hovenkamp explains that the logical foundation of the refusals to deal legal concept applies with persuasive force to the essential facilities concept.

> The so-called 'essential facility' doctrine is one of the most troublesome, incoherent and unmanageable of bases for Sherman § 2 liability. The antitrust world would almost certainly be a better place if it were jettisoned, with a little fine tuning of the general doctrine of the monopolist's refusal to deal to fill in the resulting gaps.

Hovenkamp, p. 305.

### 2. The Focus is on Markets With Large Capital Requirements

The doctrine protects a competitor from having to enter an additional market with large capital requirements in order to compete. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 540 (7th Cir.1986). Professors Areeda and Hovenkamp explain, "[t]he core concern of the doctrine is that a monopolist possess a resource that is 'essential' in some sense for the business of someone else, but that the monopolist refuses to share." IIIA AREEDA & HOVENKAMP, ¶ 772a (2d ed.2002). By controlling the "essential facility," a monopolist can potentially extend its monopoly power "from one stage of production to another, and from one market to another." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983).

### 3. Doctrinal Support

On at least three occasions, the Supreme Court has declined to recognize the essential facilities theory. "We have never recognized such a doctrine, *see Aspen Skiing Co.*, 472 U.S. 585 at 611, n. 44, 105 S.Ct. 2847; *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366 at 428, 119 S.Ct. 721, 142 L.Ed.2d 835 (opinion of Breyer, J.), and we find no need either to recognize it or to repudiate it here." *Trinko*, at 881.

Professor Elhauge explains that, the absence of Supreme Court recognition notwithstanding, "every federal circuit court has interpreted this general monopolization standard to impose an antitrust duty to deal with rivals when sharing is feasible and a monopolist has developed a product that is so superior that it is 'essential' for rivals to compete and cannot practicably be duplicated." Einer Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 261 (2003) (citing cases).

In *Mid–Texas Communications Sys. v. AT & T*, the Fifth Circuit recognized the essential facilities doctrine:

> The second approach to the problem of a monopolist's refusal to deal is the so-called "bottleneck" theory. Under this approach, a monopolist who controls a "facility or resource that is essential to competitive viability in the marketplace must grant access to it on reasonable terms to (its) competitors."

615 F.2d 1372, 1387 n. 12 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (citations omitted).

### 4. Elements of an Essential Facilities Claim

To prevail on an essential facilities claim a plaintiff must show:

1) the defendant is a monopolist;

2) the facility is essential;

3) the defendant has the type of control over the facility that is forbidden by the Sherman Act;

4) duplication of the facility is unreasonable or impractical;

5) the defendant denied the plaintiff use of the facility; and

6) providing access to the plaintiff was feasible.

*David L. Aldridge Co. v. Microsoft Corp.,* 995 F.Supp. 728, 752 (S.D.Tex.1998) (citing cases).

## B. The Fundamental Holding of *Trinko*

It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose. Thus, it is said that 'essential facility claims should … be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms.' P. AREEDA & H. HOVENKAMP, ANTITRUST LAW, p 150, P 773e (2003 Supp.). Respondent believes that the existence of sharing duties under the 1996 Act supports its case. We think the opposite: The 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access. To the extent respondent's 'essential facilities' argument is distinct from its general § 2 argument, we reject it.

*Trinko,* at 881.

## C. Plaintiff Attempts to Distinguish *Trinko's* Fundamental Holding

Z–Tel has also asserted claims under the essential facilities doctrine. *Trinko* emphasizes the importance of the 'unavailability of *access*' to the essential facility and notes that the theory cannot apply if 'a state or federal agency has effective power to compel sharing and to regulate its scope and terms.' *Trinko,* 124 S.Ct. at 881. This limitation has no bearing on Z–Tel's claims. SBC ignores that Z–Tel's AIN allegations relate to the enhanced services market, a market that the unbundled access provisions of the Telecom Act do not purport to regulate. Likewise, Z–Tel's allegations make plain that there was no effective power to compel access to shared transport; despite repeated orders of state and feder-al agencies over a period of several years, SBC still refused to provide it. (Doc. No. 37, p. 7) (emphasis in original).

## D. Analysis

### 1. In Plaintiff's Value–Added Process, Network Access Precedes the Creation of Enhanced Services

Plaintiff's Complaint is unambiguous: "[t]hese enhanced services are software-based systems that rely in part on the infrastructure necessary to provide basic local service but which also include additional programs and equipment." (Doc. No. 1, p. 12). Plaintiff may be correct that the Telecom Act does not purport to regulate enhanced services. If so, this fact likely reflects the fact that enhances services did not exist, as such, in 1996. In any event, since network access is largely indispensable to (and therefore precedes the creation of) enhanced services, Plaintiff's attempt to differentiate *Trinko* is unavailing.

### 2. "Effective Power" is an Argument Better Addressed to the Legislature

Moreover, the strength of the "effective power" wielded by the relevant regulatory agencies is not of immediate concern to this Court. This argument is better addressed to the appropriate legislative bodies.

## E. Conclusion

Defendant's Motion to Dismiss Plaintiff's Essential Facilities claim (Count No. 2) is **GRANTED**. Plaintiff's Second Cause of Action is **DISMISSED with prejudice.**

## XI. ATTEMPTED MONOPOLIZATION

## A. Legal Standards

To demonstrate attempted monopolization, a plaintiff must prove 1) that the

defendant has engaged in predatory or anticompetitive conduct with 2) a specific intent to monopolize, and 3) a dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also Taylor Publ'g Co. v. Jostens Inc.*, 216 F.3d 465, 474 (5th Cir.2000) (*citing Spectrum Sports* ). An attempted monopolization claim necessarily involves conduct which has not yet succeeded; otherwise, the plaintiff would bring an actual monopolization claim. *Taylor Publ'g*, 216 F.3d at 474; *see also Multiflex v. Samuel Moore & Co.*, 709 F.2d 980, 990 (5th Cir. 1983) ("Attempted monopolization under section 2 is usually defined as an unsuccessful attempt to achieve monopolization.").

## B. Defendant Does Not Particularize an Argument Trained on Attempted Monopolization

In neither 1) the Motion to Dismiss (Doc. No. 7) or 2) Defendant's Reply in Support of its Motion to Dismiss (Doc. No. 29) does Defendant particularly address attempted monopolization. It follows that Defendant's argument concerning attempted monopolization is limited to the legal sufficiency of Plaintiff's allegations concerning anticompetitive conduct. Plaintiff's allegations of exclusionary conduct were discussed at length in Parts VIII and IX, *supra.* Defendant's arguments were found to be unavailing.

Since Defendant raises no arguments concerning a specific intent to monopolize and/or a dangerous probability of achieving monopoly power, the Court does not devote any analysis thereto.

## C. Conclusion

Defendant's Motion to Dismiss Plaintiff's Attempted Monopolization claim (Count No. 3) is **DENIED.**

## XII. MONOPOLY LEVERAGING

### A. Defendant's Argument

██] The [*Trinko*] Court also expressly rejected the "monopoly leveraging" theory Z–Tel espouses in this case as inconsistent with Supreme Court precedent under Section 2.

(Doc. No. 29, p. 1–2).

### B. *Trinko* Rejected A Claim of Monopoly Leveraging Only Once It Abjured the Plaintiff's Refusal to Deal Argument

The Court of Appeals also thought that respondent's complaint might state a claim under a 'monopoly leveraging' theory (a theory barely discussed by respondent, see Brief for Respondent 24, n 10). We disagree. To the extent the Court of Appeals dispensed with a requirement that there be a 'dangerous probability of success' in monopolizing a second market, it erred. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In any event, leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected.

*Trinko,* at 883.

### C. Monopoly Leveraging is Not Inconsistent With Supreme Court Precedent

Professor Hovenkamp explains this somewhat murky area of antitrust jurisprudence:

In a footnote in its 1992 *Kodak* decision, the Supreme Court seemed to breathe new life into the leverage theory:

The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits

his dominant position in one market to expand his empire into the next.'

That statement seemed calculated to resurrect a dubious theory whose main effect had been to preserve the Sherman Act as a small business protection statute. However, less than a year later, in *Spectrum Sports,* the Court seemed to reject the theory altogether.

> § 2 [of the Sherman Act] makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so. The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unlawful' or 'predatory tactics.'

The statements in *Kodak* and *Spectrum Sports* were both dicta, and neither case involved a leverage claim as such.

HOVENKAMP, 318.

For these reasons, this Court does not agree Defendant's assertion that a monopoly leveraging claim is inconsistent with Supreme Court precedent under § 2.

### D. Defendant Limited its Argument to the Specific Analysis Presented in *Trinko*

Defendant chose to limit its argument concerning monopoly leveraging to the particular analysis presented in *Trinko.* In that case, the absence of legally cognizable anticompetitive conduct animated the Court's decision. In the case at bar, the Court finds that most of Plaintiff's allegations of anticompetitive conduct do not fail as a matter of law at the motion to dismiss stage. Under the logic of *Trinko,* Plaintiff's monopoly leveraging claim will not fail. Since Defendant presents no other arguments concerning monopoly leveraging, the Court does not proceed further.

### E. Conclusion

Defendant's Motion to Dismiss Plaintiff's Monopoly Leveraging claim (Count No. 4) is **DENIED**.

## XIII. TYING

### A. Plaintiff's Tying Claim

▮▮ In relevant part, Plaintiff's Tying claim reads as follows:

> SBC requires customers of its DSL service to agree to purchase basic local service only from SBC and not from any competitive carrier in a deliberate effort to preserve and maintain its monopoly in the basic local and enhanced services market. If an SBC DSL subscriber attempts to change carriers from SBC to Z–Tel, SBC will either terminate the customer's DSL access, or will deny Z–Tel the ability to provide basic local service to that customer.

> The relevant tying market is the market for DSL service or, alternatively, the market for broadband internet access. The relevant tied markets are the basic local services market and the enhanced services market.

> SBC's tying scheme imposes prohibitively higher switching costs on customers in order for SBC to maintain or expand its monopoly power in the basic local and enhanced services. Were it not for SBC's illegal tying arrangement, some customers would purchase basic local and enhanced services from carriers other than SBC.

> In addition, SBC has tied its basic local service to its enhanced services, and its enhanced services to its basic local service.

> SBC will not sell basic local service to customers unless they agree not to buy enhanced services from Z–Tel and other competing carriers (and, indeed, SBC makes such purchases impossible by re-

fusing to provide access to AIN and Z–Tel and other competing carriers). SBC, likewise, will not sell enhanced services to customers unless they agree to purchase their basic local service from SBC.

(Doc. No. 1, p. 41–42).

## B. Legal Standards

### 1. Definition

A "tying" arrangement is one in which a seller of a product or service refuses to sell a product desired by a buyer unless the buyer also agrees to purchase a second product which is not desired. *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n. 2 (5th Cir.1996), *cert. denied*, 519 U.S. 1116, 117 S.Ct. 960, 136 L.Ed.2d 846 (1997). The desired product is the "tying product," and the second product is the "tied product." *Id.*

Professor Leslie explains, "[a] tying arrangement exists when a seller refuses to sell one product, 'the tying product,' unless the buyer also purchases a second product, 'the tied product.' " Christopher R. Leslie, *Unilaterally Imposed Tying Arrangements and Antitrust's Concerted Action Requirement*, 60 Ohio St. L.J. 1773, 1773 (1999).

### 2. Elements of the Claim

Plaintiff must establish each of the following five elements for an illegal "tying" arrangement to exist: (1) there were two separate and distinct products, as opposed to components of a single product; (2) the two products were tied together, or customers were coerced into buying the tied product; (3) the seller possessed substantial economic power over the tying product; (4) the tie has an anticompetitive effect on the tied market; and (5) the tie affected more than an insubstantial volume

of commerce. *United Farmers Agents*, 89 F.3d at 236 n. 2 (*citing Kodak*, 504 U.S. at 461–62, 112 S.Ct. 2072 and *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11–28, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)); *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

## C. Defendant's Argument Is Threefold

### 1. Defendant Asserts That it Cannot be Held Liable for Declining to Offer Service Over A Line that Plaintiff Exclusively Controls

#### a. Arguments Presented in the Motion and Reply

When Z–Tel wishes to provide voice service, it does so by leasing (among other things) the local loop over which Defendants have been providing *both* voice *and* DSL service. *See* Compl. ¶ 29. Pursuant to FCC regulations, Defendants no longer have any right to provide any service—voice or data—over that line, because they are required to give up control of the *actual copper wire*, not some part or all of the usable bandwidth within it. *Local Competition Order*, 11 FCC Rcd at 15693, ¶ 385. Thus, Z–Tel gains 'exclusive control over network facilities dedicated to particular end users,' a policy choice that the FCC determined would 'provide[ ] such carriers the maximum flexibility to offer new services to such end users.' *Id.*; 47 C.F.R. § 51.319(a)(1).

(Doc. No. 7, p. 18) (italics in original).

Defendant further develops this argument in its Reply:

Z–Tel's 'tying' claim that is, its claim that defendants violate the antitrust laws by failing to offer DSL service to Z–Tel's voice customers fails because SBC's ILECs have no right to use the

lines that Z–Tel leases to offer any service to Z–Tel's customers. Z–Tel does not and cannot in good faith contest that defendants require Z–Tel's permission to provide DSL service over the lines that Z–Tel leases.

(Doc. No. 29, p. 3).

### b. *Levine v. Bellsouth*

Defendant directs the Court's attention to *Levine v. Bellsouth Corp.*, No. 03–20274–CIV. This unpublished order, which Defendant attaches as Exhibit A to its original motion, dismissed a tying claim similar to the one presented in the case at bar.

In *Levine*, the district court was presented with the defendant's motion to dismiss, *inter alia*, the plaintiff's tying claim. In the plaintiff's view, the defendant's provision of DSL service (the tying product) on the condition that the customer also bought local service (the tied product) predicated a legally cognizable claim. The defendant took the position that "in cases where a CLEC leases a loop for providing service, BellSouth is 'required to surrender the entire loop to the CLEC.'" *Id.* at p. 12. In other words, the defendant argued that it was physically impossible for it to effectuate the alleged tie.

The court described the plaintiff's response as follows:

Plaintiff argues there is no basis for suggesting that a CLEC would prevent BellSouth from providing DSL service to a CLEC customer, that BellSouth's practices are based on its own internal decisions and not restrictions imposed by CLECs or regulators, and that BellSouth 'almost always has more than one loop connecting a customer's premises to BellSouth's network.'

*Id.*

The court rejected the plaintiff's argument:

Plaintiff has not, however, alleged sufficient facts to support its conclusions regarding feasibility. Its arguments disputing BellSouth's contentions are not supported by sufficient allegations that a CLEC would not prevent BellSouth from providing DSL service to a CLEC customer, nor are there sufficient allegations supporting Plaintiff's argument that BellSouth could provide DSL service over the same or a standalone loop.

*Id.* at p. 13.

### 2. In its Reply, Defendant Adds A New Argument That *Trinko* Bars Z–Tel's Claims

In its Reply, Defendant offers several doctrinal and prudential arguments for reading *Trinko* so as to warrant dismissal of Plaintiff's tying claim.

[D]efendants do not voluntarily provide DSL service on a stand-alone basis and have not set a retail price for providing DSL service over lines controlled by CLECs (whose permission they must obtain before offering the service). Mandating such an arrangement would require 'considerable expense and effort' including designing and implementing '[n]ew systems'—for ordering, provisioning, billing, and maintenance—to accommodate Z–Tel's demand. *Id. Trinko* makes clear that antitrust law imposes no such duty.

(Doc. No. 29, p. 5).

### 3. Defendant Maintains that Plaintiff's Claim is Inconsistent With A Controlling FCC Review Order

The FCC carefully considered the position (espoused by Z–Tel here) and rejected it. The FCC, in fact, went further: in a closely related context, it made clear that the type of duty Z–Tel seeks to impose would undermine competitors' incentives to innovate and thereby hurt consumers. In light of the

FCC's ruling, Z–Tel's claim cannot proceed.

(Doc. No. 7, p. 19; *see also* Doc. No. 29, p. 4–7 (making similar arguments)).

### D. Plaintiff's Response

#### 1. The Feasability on the Part of Defendant to Provide Both DSL and Local Services

#### a. Defendant Could Sell DSL to Plaintiff's Basic Local Customers If it So Desired

Plaintiff begins by stating its version of *Levine*'s fundamental holding concerning tying arrangements:

> [The consumers'] arguments disputing BellSouth's contentions are not supported by sufficient allegations that a CLEC would not prevent BellSouth from providing DSL service to a CLEC customer.

(Doc. No. 22, p. 14) (*quoting Levine*, p. 13)

Plaintiff then seeks to distinguish *Levine:*

> The lack of such allegations is not a problem in this case. Rather than seeking to take advantage of potentially greater profits from sales of DSL to non-SBC customers, SBC forgoes that profit to preserve its basic local service monopoly. When SBC customers with DSL call Z–Tel and seek to switch to Z–Tel's basic local service, Z–Tel is not able to provide the service: SBC will either refuse to allow Z–Tel to provide basic local service to the customer or it will allow the switch, but will cut off the customer's DSL service. Comp. ¶ 50.

*Id.* at p. 14–15.

#### b. Plaintiff Further Develops its "Potentially Greater Profits" Allegation in its Sur–Reply

In its Sur–Reply, Plaintiff further develops its allegation concerning Defendant's alleged abnegation of profits.

SBC has refused to provide DSL service to its own DSL customers when they switch to Z–Tel for basic local service. SBC refuses these DSL profits merely to make it more difficult for Z–Tel to compete in the basic local services market. When SBC refuses to provide DSL service to lines leased by Z–Tel, SBC contents itself with only the wholesale revenue it receives from Z–Tel, when it could instead receive both that wholesale revenue *and* the retail DSL revenues from the customer. In other words, SBC could make *more* money on the sale of DSL to non-SBC basic local exchange customers than it can from its own customers because it can collect both wholesale and retail profits.

(Doc. No. 37, p. 9) (emphasis in original).

#### c. In the Sur–Reply, Plaintiff Also Includes An Argument That Defendant Provides DSL Service to Some of its Customers Through A Separate Subsidiary

SBC repeats its meritless argument that it cannot provide DSL to Z–Tel's customers because the line has been leased to Z–Tel. SBC, however, provides DSL not through the SBC entity that owns the lines, but through a separate subsidiary.

*Id.*

#### 2. FCC Review Order

SBC was required, as a condition of its merger with Ameritech, to form a subsidiary competitive DSL provider, and the very paragraph of the Triennial Review Order SBC cites specifically authorized 'partnering with a second competitive LEC [such as SBC's affiliate] that will offer xDSL service.' Triennial Review Order ¶ 270.

(Doc. No. 22, p. 16)

Note that "xDSL" is as written in Plaintiff's brief. It is unclear if "x DSL" differs

from ordinary DSL. The Court operates on the assumption that any difference is immaterial.

### E. Analysis

#### 1. Plaintiff Alleges A Cognizable Claim Concerning the Feasability of Defendant's Provision of DSL to Z–Tel's Local Service Customers

The crux of Defendant's argument is that once Plaintiff elects to use a line for voice service, FCC regulations remove from Defendant any right to provide service—voice or data—over that line. This is so because Defendant is required to give up control of the actual copper wire. For this reason, Defendant maintains that it has no choice but to cut-off its DSL customers who wish to switch to Plaintiff for basic local services.

Plaintiff's response concerning Defendant's alleged decision to forgo profits assumes the answer to the question. It is fairly tautological that Defendant can only forgo profits if profit opportunities exist. Without more, Defendant would prevail. However, Plaintiff alleges that Defendant furnishes DSL through "a separate subsidiary." If this separate subsidiary is the vehicle by which Defendant seizes these profit opportunities, then such opportunities must exist. For this reason, Defendant's first argument to dismiss Plaintiff's Tying claim fails.

#### 2. Defendant's Reliance on *Trinko* Is Misplaced

The impact of *Trinko* in the context of § 2 violations was addressed at length in Parts VII–X, *supra*. To briefly review, *Trinko*'s second sentence reads as follows: "In this case we consider whether a complaint alleging breach of the incumbent's duty under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act, 26 Stat 209." *Trinko*, at 875. In other words, *Trinko* was a § 2 case at heart. It is with that thought in mind that this Court notes that the words "tying" or "tie" do not readily appear in *Trinko*'s text. Tie-ins may be illegal under § 1 of the Sherman Act.[2] The Court declines to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion. For this reason, Defendant's second argument to dismiss Plaintiff's Tying claim fails.

#### 3. Review Order

The crux of Defendant's argument concerning the *Triennial Review Order* reads as follows:

> In its *Triennial Review Order*, the FCC has already examined possible competitive benefits of requiring ILECs to provide retail DSL service over lines leased by CLECs and determined not only that such a regulatory requirement would bring no benefit but also that it would discourage investment and innovation and thus *harm* consumers.

(Doc. No. 29, p. 6).

As explained in Part XIII, E. 1, *supra*, Plaintiff alleges that Defendant furnishes DSL through "a separate subsidiary." Provision of DSL service through such a separate subsidiary is the obverse of "ILECs to provid[ing] retail DSL service over lines leased by CLECs." For this reason, Defendant's third argument to dismiss Plaintiff's Tying claim fails.

#### 4. A Potential Issue of Confusion: the Market for DSL Versus Broadband Services

In its Complaint, Plaintiff is clear, "[t]he relevant tying market is the market for

---

**2.** For sake of completeness, the Court also notes that tie-ins may be illegal under Section 3 of the Clayton Act. However, the Clayton Act only applies to goods. In this case, the focus is obviously on services, not goods.

DSL service or, alternatively, the market for broadband internet access." (Doc. No. 1, p. 41). In its Opposition to Defendant's Motion to Dismiss, Plaintiff emphatically declares, "SBC challenges only the DSL allegations." (Doc. No. 22, p. 13). In other words, Plaintiff maintains that Defendant does not contest the tying claim as concerns the tying market for broadband internet services.

The Court does not agree. The word "alternatively" is disjunctive. The Court has analyzed Plaintiff's Tying claim on the basis of a tying market for DSL service. Plaintiff's Complaint indicates that an alternative market for broadband internet access need not be considered. So as to avoid any confusion, Plaintiff's Tying claim involving a tying market for broadband internet access is **DISMISSED without prejudice to repleading.**

### F. Conclusion

Defendant's Motion to Dismiss Plaintiff's Tying Claim (Count No. 5) is **DENIED,** except insofar as Plaintiff seeks to pursue a Tying claim involving a tying market for broadband internet access. Since Plaintiff's complaint uses the disjunctive word "alternatively," the Tying claim involving a tying market for broadband internet access is **DISMISSED without prejudice to repleading.**

## XIV. SUBJECT MATTER JURISDICTION AND THE BREACH OF CONTRACT CLAIM

### A. Defendant's Argument Regarding Plaintiff's Breach of Contract Claim

#### 1. Introduction

■■■ Defendant seeks dismissal of Plaintiff's breach of contract claim (Count No. 11) on the grounds that it "fall[s] outside of the Court's subject matter jurisdiction." (Doc. No. 7, p. 22). Particularly, Defendant advances the argument that the

Telecommunications Act requires these claims be addressed by "appropriate regulatory agencies." *Id.*

If Defendant successfully pierces the breach of contract claim, it feels that the other claims arising out of the alleged breaches of the interconnection agreement ineluctably fail as a matter of course. *See* Doc. No. 7, p. 24 ("These allegations—and all of the causes of action that depend on them—thus implicate the expertise of the expert state commissions no less than Z–Tel's breach of contract claim."). For this reason, the Court addresses the breach of contract claim first. The contract at issue is the interconnection agreement. (Doc. No. 1, p. 50).

#### 2. Defendant's Argument is Twofold

##### a. *Southwestern Bell Tel. Co. v. PUC*

Section 252 of the Telecommunications Act establishes a remedial scheme for CLECs that believe they have been wronged by an ILEC's failure to comply with the terms of an interconnection agreement. Defendant cites *Southwestern Bell Tel. Co. v. PUC* for the proposition that " 'a dispute . . . seeking interpretation and enforcement of the agreement, . . . falls within a state's responsibilities under Section 252.' 208 F.3d 475, 480–81 (5th Cir.2000)." (Doc. No. 7, p. 23).

##### b. Doctrinal Support From Federal District Courts

Defendant relies on six (6) district court decisions for its conclusion that "Z–Tel's contract claims must be addressed to the appropriate state commissions in the first instance, not in federal court." *Id.* n. 15.

### B. Plaintiff's Response

Plaintiff's response seeks to characterize Defendant's argument as follows: "SBC makes the remarkable claim that

§ 252(e)(6) divests federal courts of jurisdiction granted by 28 U.S.C. §§ 1331 and 1367." (Doc. No. 22, p. 17). First, Plaintiff offers a reading of *Southwestern Bell* different from that offered by Defendant.

> SBC cannot rely on *Southwestern Bell Tel. Co. v. PUC,* 208 F.3d 475 (5th Cir. 2000), for its mistaken claim that jurisdiction over breach of contract claims based on interconnection agreements is vested *exclusively* in state commissions. The Fifth Circuit did not rule that contract claims under interconnection agreements *must* be presented to a state commission before such claims may be asserted in federal district court, but only that such claims *may* be presented to the commission first.

*Id.* at 17–18.

Second, Plaintiff cites three Supreme Court cases, *Ben. Nat'l Bank v. Anderson,* 539 U.S. 1, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003), *Gulf Offshore Co., Div. of Pool Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), and *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) for the proposition "that a grant of exclusive jurisdiction must be explicitly stated in the statute; it will not be inferred." *Id.* at p. 18.

## C. Defendant's Response

First, Defendant notes that "Z–Tel does not discuss or even acknowledge any of six federal cases identified in [D]efendants' opening brief squarely holding that claims alleging breach of the 1996 Act interconnection agreements must be addressed to state commissions in the first instance, not to federal courts." (Doc. No. 29, p. 7).

Second, Defendant is emphatic that its argument is not that federal district courts have been stripped of the federal question jurisdiction. Rather, "the 1996 Act 'strips federal district courts of their federal question jurisdiction as to questions that

have not been presented *first* to a state PSC'; federal court review is confined to *review* of state-commission determinations." *Id.* (italics in original).

## D. Plaintiff's Sur–Reply Argument Adds a New Case, But Nothing New

Plaintiff's Sur–Reply quotes *United States v. American Tel. & Tel. Co.,* 461 F.Supp. 1314, 1329 n. 45 (D.D.C.1978) for the proposition that "[a] referral under [primary jurisdiction] doctrine does not oust a court of jurisdiction; it merely serves as means for requesting a regulatory agency to make preliminary factual and legal determinations while reserving to the court the authority to decide the ultimate questions."

## E. Analysis

### 1. Plaintiff's Reliance on *AT & T* is Misplaced

As an initial matter, the Court notes that Plaintiff's reliance on *United States v. American Tel. & Tel. Co.* is misplaced. The quoted portion of the *AT & T* order explains that federal courts must wait for regulatory agencies to perform their task. This is precisely the point Defendant seeks to make.

### 2. The Telecommunications Act Assigns Enforcement Authority to State Commissions

Under the Telecommunications Act, state regulatory bodies are charged with making the initial "determination" of any disputes between parties regarding the interpretation and enforcement of interconnection agreements. 47 U.S.C. § 252(e)(6); *see also Southwestern Bell Tel. Co. v. Connect Communications. Corp.,* 225 F.3d 942, 946 (8th Cir.2000) ("The Act provides that an interconnection agreement, reached either by negotiation or arbitration, must be submitted to the

state commission for approval ... [t]his grant of power to state commissions necessarily includes the power to enforce the interconnection agreement.").

### 3. Once A Party Has Been "Aggrieved" By A State Commission, it May File Suit in Federal Court

A section of the Telecommunications Act entitled, "Review of State commission actions" reads as follows:

> In any case in which a State commission makes a determination under this section, **any party aggrieved** by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [47 USCS § 251] and this section.

47 U.S.C. § 252(e)(6) (emphasis added).

### 4. Plaintiff Misreads The Fifth Circuit's Holding in *Southwestern Bell*

Contrary to Plaintiff's characterization of the opinion, in *Southwestern Bell Tel. Co. v. PUC*, the Fifth Circuit held that state regulatory agencies have the principal role in determining claims that arise under the Act. "We believe that the FCC plainly expects state commissions to decide intermediation and enforcement disputes that arise after the approval procedures are complete." 208 F.3d 475, 480 (5th Cir.2000).

### 5. Substantial Doctrine Correlates With *Southwestern Bell*

Other courts have followed the Fifth Circuit's lead. *See Intermedia Communications, Inc. v. Bellsouth Telecomms., Inc.,* 173 F.Supp.2d 1282, 1287 (M.D.Fla.2000) (holding that parties "must first bring their claims of violations of § 251 to the state PSC before a federal court has jurisdiction over the matter"). In *Contact Communications. v. Qwest Corp.,* the dis-

trict court was presented with an action for breach of two interconnection agreements brought pursuant to diversity jurisdiction. 246 F.Supp.2d 1184 (D.Wyo.2003). In dismissing the claim, the court also explained, "[i]t is clear to this Court that absent a prior determination of the issue by the state PSC, no federal court jurisdiction exists." *Id.* at 1189 (*citing Southwestern Bell Tel. Co. v. PUC and Intermedia Communications*).

### 6. Conclusion

In the section of its complaint detailing its various causes of action, Plaintiff does not allege a violation of § 252 by name. However, the contract at issue in Plaintiff's Breach of Contract action is the interconnection agreement about which § 252 speaks. Plaintiff cannot call a § 252 violation by another name (i.e., breach of contract) and avoid the controlling legal standards. For these reasons, Defendant's Motion to Dismiss Plaintiff's Breach of Contract claim (Count No. 11) is **GRANTED without prejudice.** If Plaintiff chooses to replead, it must show that a determination has been made by the state regulatory agency. Furthermore, Plaintiff must show that it has been "aggrieved" by this determination as required by 47 U.S.C. § 252(e)(6).

## XV. SUBJECT MATTER JURISDICTION AND THE § 251 CLAIM

### A. Arguments of the Parties

#### 1. Defendant's Argument

 Section 251 describes the interconnection duties required of ILECs. First, Defendant argues that this particular complaint was previously adjudicated by the FCC and is now on appeal in the D.C. Circuit. (Doc. No. 7, p. 36). Furthermore, Defendant maintains that this is

relevant because the plain text of Section 207 states that parties may file a complaint with the FCC or in federal district court, but not both. *Id.*

Second, Defendant argues that general principles of claim preclusion bar Plaintiff's claim. *Id.* at 37.

### 2. Plaintiff's Response

Plaintiff responds that Defendant's reliance on Section 207 is misplaced; Section 207 controls claims for damages, whereas Plaintiff's FCC claim was brought pursuant to Section 208, which controls complaints to the FCC in general. In Plaintiff's view, a claim brought pursuant to Section 208 avoids the exclusionary language of Section 207. Moreover, Plaintiff's FCC complaint expressly indicated that no damages were being sought. (Doc. No. 22, p. 36).

Plaintiff also maintains that claim preclusion has no applicability to the Section 251 claim because the case at bar represents "supplemental relief." *Id.* at 37.

### 3. Defendant's Reply

In reply, Defendant first reiterates its prior argument that Section 207 disposes of the Section 251 claim. Second, Defendant directs the Court's attention to paragraph 99 of the FCC complaint, where Plaintiff expressed an intent to "seek damages including, but not limited to, damages for lost customers, profits, goodwill, and increased costs." (Doc. No. 29, p. 17, n. 15).

### 4. Plaintiff's Sur–Reply

Plaintiff is emphatic that its FCC complaint did not seek damages. (Doc. No. 37, p. 17). Plaintiff also clarifies its argument that the situation at hand is a "bifurcated determination of liability and damages." *Id.* at p. 18, n. 23. Viewed in this light, the cases cited by Defendant are inapposite because "[t]hey involve claimants who re-

ceived determinations as to both liability and damages and then filed identical claims in court." *Id.*

## B. Analysis

### 1. The FCC Rules Do Not Discuss Bifurcation in the Sense in Which Plaintiff Uses the Term

#### a. Section 1.722

Plaintiff relies on 47 C.F.R. § 1.722 for the proposition that "[u]nder FCC rules, a party may request that the FCC bifurcate liability and damage questions. The FCC rules state that when a party makes this election, the damages proceeding is 'separate from and subsequent to' the liability complaint." (Doc. No. 37, p. 18). It does not follow that the damages proceeding is to be heard in federal court. This point is made clear in the relevant section of this regulation:

> (i) Where a complainant files a supplemental complaint for damages in accordance with paragraph (e) of this section, the following procedures may apply:
>
> (1) Issues concerning the amount, if any, of damages may be either designated by the Enforcement Bureau for hearing before, or, if the parties agree, submitted for mediation to, a Commission Administrative Law Judge. Such Administrative Law Judge shall be chosen in the following manner:
>
> (i) By agreement of the parties and the Chief Administrative Law Judge; or
>
> (ii) In the absence of such agreement, the Chief Administrative Law Judge shall designate the Administrative Law Judge.

#### b. Section 208

Plaintiff argues that its claim is not subject to the dictates of Section 207 because its FCC complaint was predicated under Section 208. Section 208 reads as follows:

§ 208. Complaints to Commission; investigations; duration of investigation; appeal of order concluding investigation

(a) Any person, any body politic or municipal organization, or State commission, complaining of anything done or omitted to be done by any common carrier subject to this Act, in contravention of the provisions thereof, may apply to said Commission by petition which shall briefly state the facts, whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint or to answer the same in writing within a reasonable time to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been caused, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant.

(b)(1) Except as provided in paragraph (2), the Commission shall, with respect to any investigation under this section of the lawfulness of a charge, classification, regulation, or practice, issue an order concluding such investigation within 5 months after the date on which the complaint was filed.

(2) The Commission shall, with respect to any such investigation initiated prior to the date of enactment of this subsection [enacted Nov. 3, 1988], issue an order concluding the investigation not later than 12 months after such date of enactment.

(3) Any order concluding an investigation under paragraph (1) or (2) shall be a final order and may be appealed under section 402(a) [47 USCS § 402(a)].

The Court's attention is particularly drawn to subpart three (3), which references appeals under Section 402. Section 402 is entitled, "Judicial review of Commission's orders and decisions." The first sentence reads, "Any proceeding to enjoin, set aside, annul or suspend any order of the Commission under this Act...". In other words, as the title of Section 402 suggests, the rule envisages ordinary appeals. It is fairly obvious that an appeal is very different from a fresh action for damages in a district court. The bottom line is that Plaintiff's reliance on Section 208 is misplaced.

## 2. Fifth Circuit Doctrine Abjures the Formal/Informal Complaint Distinction Plaintiff Relies Upon

Plaintiff cites *Cancall PCS, LLC v. Omnipoint Corp.*, 2000 WL 272309 (S.D.N.Y. 2000), 2000 U.S. Dist. LEXIS 2830 (Schwartz, J.) for the proposition that the filing of an "informal complaint" with the FCC does not bring the complainant within the ambit of Section 207. (Doc. No. 29, p. 36). This Court respectfully reads the law differently than does Judge Schwartz. The section of *Cancall* Plaintiff refers to reads as follows:

> Section 207 thus 'precludes a complainant from filing suit in federal court once she has initiated the administrative complaint process with the FCC either by filing a formal or informal complaint.' *Stiles v. GTE Southwest Inc.*, 128 F.3d 904, 906 (5th Cir.1997). However, only those claims and remedies sought by the plaintiffs in their informal complaint are barred from being brought in federal

court. *See RCA Global Communications, Inc. v. Western Union Telegraph Co.,* 521 F.Supp. 998, 1005—1006 (S.D.N.Y.1981) ('Accordingly, we find that [the plaintiff] has not presented its claim for damages . . . to the FCC, and conclude that the FCC does not have exclusive jurisdiction over the claim under § 207.').

*Stiles v. GTE Southwest* is the case on which Defendant places primary emphasis. In *Stiles,* the Court was clear:

> In this case, the language of the statute is unambiguous: A complainant can file a complaint either with the FCC or in federal district court, but not in both. Contrary to Stiles's arguments, § 207 draws no distinction between formal and informal complaints and the fact that the FCC has decided to provide both formal and informal complaint proceedings does not alter the clear language of the statute.

128 F.3d 904, 907 (5th Cir.1997).

Whatever the state of the law elsewhere, this Court is guided by the clear teaching of *Stiles.* In the Fifth Circuit, regardless of whether Plaintiff filed a formal or informal complaint, Section 207 is controlling.

### 3. Plaintiff's FCC Complaint Presents an Issue of Some Confusion

■ Arguably, Plaintiff's complaint in this action could proceed if it is not predicated upon the same issues as the prior FCC action. This issue goes to Defendant's claim preclusion argument. The FCC complaint is therefore highly relevant. Plaintiff attaches the FCC complaint as Exhibit H to its original opposition to Defendant's motion to dismiss. Plaintiff is clear, "[t]his complaint, however, was not brought for damages and Z–Tel expressly indicated that damages were not being sought in the proceeding." (Doc. No. 22, p. 36) (*citing* page 2 of Exhibit H). The second page of Exhibit H

is entitled "Formal Complaint Intake Form." In very small print, a checklist on this form reads "If damages are sought in this Complaint, the Complaint comports with the specifications prescribed by 47 U.S.C. Section 1.722(a), (c)." Written next to this sentence is a notation, "N/A". However, the text of the complaint itself does not readily divulge the Plaintiff's "express indication that damages were not sought in the proceeding." Moreover, as explained in Part XV, B.1, *supra,* Section 1.722 does not envisage bifurcated damages/liability proceedings between the FCC and federal district courts.

In its Reply, Defendant quotes paragraphs 14 and 99 of the FCC complaint for language concerning "damages." This language would tend to cut at the heart of Plaintiff's argument. However, Exhibit H to Plaintiff's Opposition (i.e., the FCC complaint) is not numbered by paragraph. The Court is not clear what document Defendant quotes from.

### 4. Conclusion

Section 207 bars action in federal district court once an aggrieved party files a complaint with the FCC. *Stiles* directs that this result obtains upon the filing of both formal and informal complaints. Arguably, Plaintiff's complaint in this action could proceed if it is not predicated upon the same issues as the prior FCC action. There seems to be some confusion as to which document represents Plaintiff's FCC complaint.

For these reasons, Defendant's Motion to Dismiss Plaintiff's § 251 claim (Count No. 8) is **GRANTED without prejudice to repleading.** If Plaintiff chooses to replead, it should demonstrate how Plaintiff's complaint in the case at bar is predicated upon different issues vis-a-vis the prior FCC action. Having granted Defendant's motion on the more fundamental

554

grounds of subject matter jurisdiction, the Court need not address Defendant's argument concerning claim preclusion.

## XVI. TELECOMMUNICATIONS ACT § 202

### A. Plaintiff's Complaint

 Plaintiff's Complaint regarding the Telecommunications Act § 202 violation (Count No. 9) reads as follows:

SBC's course of conduct, as described above, is systematically biased to advantage customers if they purchase their basic local service from SBC rather than Z–Tel, by depriving Z–Tel of complete, timely, and accurate line loss information and accurate billing information, while simultaneously providing for itself the same information. As a consequence, SBC's customers perceive SBC's service differently than Z–Tel's, purely based on the deliberate discrimination among the different class of customers by SBC. As such, SBC has violated 47 U.S.C. § 202.

(Doc. No. 1, p. 49).

### B. Defendant's Argument

#### 1. § 202

Section 202 reads as follows:

(a) Charges, services, etc. It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

(b) Charges or services included. Charges or services, whenever referred

to in this Act, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

#### 2. Defendant's First Argument: The Activities About Which Plaintiff Complains Are Not Subject to Section 202

Defendant advances two arguments in support of its motion to dismiss Plaintiff's § 202 claim. Defendant's first argument trains on the denotation of the words "communication services." (Doc. No. 7, p. 38). Defendant places heavy emphasis on the Fifth Circuit's opinion in *Brittan Communications. Int'l Corp. v. Southwestern Bell Tel. Co.*, 313 F.3d 899 (5th Cir.2002). In *Brittan*, the plaintiff, a switchless reseller of long-distance telephone services, appealed the district court's order granting the defendant's motion for judgment on the pleadings on, *inter alia*, its § 202 claim. The Fifth Circuit affirmed Judge Kent's finding that, long distance "billing and collection services that do not utilize communications over the common carriers wire or radio facilities are not 'communications services' regulated by Title II of the Communications Act." *Id.* at 904.

#### 3. Defendant's Second Argument: Plaintiff Fails to Allege Discrimination Among Similarly Situated Classes of Customers

Defendant's second argument is that Plaintiff fails to allege disparate treatment among classes of customers. (Doc. No. 7, p. 39). Defendant cites two cases from the D.C. Circuit, *American Message Ctrs. v. F.C.C.*, 50 F.3d 35, 40 (D.C.Cir.1995) and *Competitive Telecommunications Ass'n v. F.C.C.*, 998 F.2d 1058, 1061 (D.C.Cir.1993), and a FCC order for the proposition that a

§ 202 claim trains on disparate treatment of similarly situated customers, rather than other parties. Defendant reads Plaintiff's complaint as alleging only that Defendant has treated "[itself] better than [it] ha[s] treated Z–Tel." *Id.*

## C. Plaintiff's Response

### 1. Plaintiff's First Argument: *Brittan* is Distinguishable

Plaintiff's first argument trains on Section 202's use of the words "in connection with" and seeks to distinguish *Brittan* for the following reason:

> 'Brittan and SWBT did not have a contractual relationship,' and the charges at issue were Brittan's charges to consumers, which SBC included on its bill to the consumer. Thus, in *Brittan*, SBC was not providing a 'communication service' to Brittan 'in connection with' the billing service at issue.

(Doc. No. 22, p. 39) (citation omitted).

### 2. Plaintiff's Second Argument: A Carrier's Provision of Services to Itself can be Used to Judge Service Quality

Defendant cites *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 211 n. 22 (S.D.N.Y.1999) for the proposition that a carrier's provision of services to itself can be used to judge service quality under § 202(a). (Doc. No. 22, p. 40).

## D. Analysis

### 1. The Court Does Not Accept Plaintiff's Reading of *Brittan*

In *Brittan*, the Court explained:
Although it may be true that the FCC has moved away from the position that billing and collection services are financial and administrative services, this does not persuade us to conclude that the billing and collection services at issue in this case fall within Title II. Brittan has cited no FCC decision in which the FCC has altered its view that billing and collection services provided by LECs to unaffiliated long-distance providers fall outside the scope of Title II. *See In the Matter of Federal–State Joint Board on Universal Service*, 13 F.C.C. Rcd. 24,744, P 70 & n. 87, 1998 WL 814511 (1998) (finding that billing and collection services are subject to Title II, but only as to a carrier's own billing and collections). Likewise, Brittan has cited to no case holding that billing and collection services fall within the scope of Title II.

313 F.3d, at 904.

Although carrier billing and collection for a communication service that it offers individually or as a joint offering with other carriers is an incidental part of a communication service, we believe that carrier billing or collection for the offering of another unaffiliated carrier is not a communication service for purposes of Title II of the Communications Act.

*Id.* at 905 (quoting *In the Matter of Detariffing of Billing and Collection Services*, 102 F.C.C.2d 1150, p. 31, 1986 WL 291513 (1986)).

Plaintiff's reliance on the existence, or lack thereof, of a contractual relationship carries no weight in assessing *Brittan*'s fundamental holding. Since Plaintiff's allegations of billing and line-loss services are of a type far different from the "financial and administrative services" spoken about in *Brittan*, Plaintiff has failed to state a Section 202 claim as matter of law.

### 2. Plaintiff Reads *Telecom Int'l Am.* Out of Context

Plaintiff cites *Telecom Int'l Am.* for the proposition that a carrier's provision of services to itself can be used to judge service quality under § 202(a). This is fairly undebatable. However, the focus on

"quality" is only relevant as to the provision of service to other customers. Plaintiff fails to note that immediately above the section it cites, the court in *Telecom Int'l Am.* explained:

> Courts determining whether a carrier has unlawfully discriminated utilize a tripartite test analyzing: (1) whether the services are 'like;' (2) if so, whether the carrier is offering the service to **other customers** at a 'different' price or under 'different' conditions than those offered to the petitioner; and (3) if such difference exists, whether that difference is unreasonable.

67 F.Supp.2d 189, 210 (S.D.N.Y.1999) (emphasis added).

This Court notes that *Telecom Int'l Am.* cites the same D.C. Circuit cases Defendant relies on in the case at bar. The bottom line is that the focus of a § 202 inquiry is on discrimination among customers. Plaintiff's complaint fails to make such an allegation. Herein lies an additional grounds for the Court's dismissal of Plaintiff's Section 202 claim.

### E. Conclusion

Defendant's motion to dismiss Plaintiff's Section 202 claim (Count No. 9) is **GRANTED.** Plaintiff's Section 202 claim is **DISMISSED without prejudice to repleading.**

### XVII. TELECOMMUNICATIONS ACT § 222

### A. Plaintiff's Complaint

 In its capacity as a carrier customer of SBC, Z–Tel provided SBC's wholesale operations with proprietary information concerning its customers and potential customers. SBC was required under 47 U.S.C. § 222 to use that information only to provide the wholesale services Z–Tel ordered, and, not for its own marketing efforts. SBC misused that information, in violation of Section 222 of the Act, in order to solicit those customers as SBC's own retail customers. Some of those solicited customers canceled their orders with Z–Tel and became SBC customers.

(Doc. No. 1, p. 49).

### B. Text of § 222

The text of § 222 reads as follows:

(a) In general. Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

(b) Confidentiality of carrier information. A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts.

### C. Defendant's Argument

Defendant's argument trains on the words "another carrier" found in § 222(b).

> [A]s relevant here, Section 222 prevents carriers (such as SBC's ILECs) from 'us[ing]... for its own marketing purposes' any 'proprietary information' that a 'telecommunications carrier... receives or obtains... from *another* carrier for purposes of providing any telecommunications service." 47 U.S.C. § 222(b) (emphasis added). The information Z–Tel places at issue in Count 10–the fact that a customer has left an SBC ILEC to take service from another carrier, along with a 'detailed summary' of the services the customer previously received from the SBC ILEC, *see*

Compl. ¶ 78–is Defendants' *own* information, which they possess by virtue of their own prior relationship with the customer.

(Doc. No. 7, p. 40) (italics in original).

Defendant expounds on this argument in its Reply:

Z–Tel alleges that defendants used *their own* information—the fact that a customer had stopped purchasing services from one of the defendants—in its marketing efforts. But carriers are permitted to use *their own* information, and this allegation thus does not state a claim under 47 U.S.C. § 222(b).

Z–Tel... merely rehashes the language of section 222 without providing notice of the proprietary information Z–Tel might be referring to.

(Doc. No. 29, p. 20) (italics in original).

**D. Analysis**

"Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Jones v. Alcoa, Inc.,* 339 F.3d 359, 362 (5th Cir.2003). Plaintiff fails to allege, in even the vaguest of terms, what sort of data in the furnished information Defendant allegedly misused. Even viewing all allegations in the light most favorable to the non-movant, the Court cannot conclude that Plaintiff has alleged a legally cognizable claim.

**E. Conclusion**

Defendant's Motion to Dismiss Plaintiff's Section 222 claim (Count No. 10) is **DISMISSED without prejudice to re-pleading.**

## XVIII. RICO

**A. Plaintiff's Complaint**

The crux of Plaintiff's RICO claim is that Defendant's submission of false and fraudulent invoices and defective line loss information constitutes predicate acts of racketeering activity, particularly mail and wire fraud. (Doc. No. 1, p. 42–46). Plaintiff further alleges that Defendants aid and abet each one another in this scheme. Lastly, Plaintiff alleges that the subsidiary Defendants also assume a distinct role in facilitating and masking the underlying fraud. *Id.* at p. 45.

**B. Defendant's Argument**

**1. Introduction**

To state a claim under the RICO statute, 18 U.S.C. § 1962, a plaintiff must allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Elliott v. Foufas,* 867 F.2d 877, 880 (5th Cir.1989) (*citing Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Defendant argues that Plaintiff has failed to allege elements (2) and (4).

**2. Racketeering Activity**

**a. No Intent to Deceive**

Defendant argues that Plaintiff fails to allege an intent to deceive. Defendant cites *Mazandarani v. American Express Travel Related Services Co.,* 1996 WL 608483 (N.D.Tex.1996), 1996 U.S. Dist. LEXIS 13753 for the proposition that a simple failure to perform legal obligations (i.e., lease the network as required under the interconnection agreement) does not constitute *a priori* evidence of an intent not to perform. (Doc. No. 7, p. 26–28).

**b. No Reasonable Reliance**

Defendant cites *In re Mastercard Int'l Internet Gambling Litig.,* 313 F.3d 257 (5th Cir.2002) for the proposition that a civil RICO plaintiff must also allege facts showing that it reasonably relied on the allegedly false and fraudulent statements. (Doc. No. 7, p. 28). Defendant asserts Plaintiff did not so rely, as evidenced by

Plaintiff's actions in lodging many complaints with Defendant about its service, or faulty provision thereof. In other words, Defendant maintains that Plaintiff's claim fails because Plaintiff knew about the lack of truth about which it now complains.

#### c. No Acquisition or Maintenance

But plaintiff does not offer even a conclusory allegation, let alone well-pleaded facts, suggesting that SBC *acquired* its subsidiaries by virtue of the alleged scheme to defraud Z–Tel; rather, the complaint acknowledges that SBC acquired its subsidiaries years *before* the alleged scheme was hatched in 1999.

(Doc. No. 7, p. 29) (italics in original).

Defendant also directs the Court's attention to a case involving an "analogous complaint," *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir.1996). *Id.* at 30.

#### 3. No Distinct Enterprise

First, Defendant cites authority for the proposition that a corporation cannot be both the enterprise and the RICO perpetrator. For this reason, the Defendant subsidiaries are wrongly conflated with RICO persons. Defendant seeks to distinguish this Court's order in *Office Outfitters v. A.B. Dick Co.*, 83 F.Supp.2d 772 (E.D.Tex.2000) from a recent Seventh Circuit opinion holding that subsidiaries and their parent companies are insufficiently distinct to trigger RICO liability. (Doc. No. 7, p. 31–33).

#### C. Plaintiff's Response

#### 1. Intent May Be Averred Generally

First, Plaintiff points out that under FED. R. CIV. P. 9(b), intent may be averred generally. (Doc. No. 22, p. 24). Plaintiff also adduced authority for the proposition that intent to commit fraud is usually a question of fact.

#### 2. Simply "Raising Questions" Does Not Vitiate Reliance

Raising questions regarding representations in some invoices is hardly synonymous with actual knowledge of fraudulent statements in those invoices, much less with other invoices as to which Z–Tel had no knowledge of falsity at the time they were paid.

(Doc. No. 22, p. 26).

#### 3. Defendant Misreads *Office Outfitters*

Plaintiff reads *Office Outfitters* as having rejected the restrictive view of the maintenance requirement adopted by the Second Circuit in *Discon.* Plaintiff asserts that an allegation that one took steps to enhance or protect value is sufficient. (Doc. No. 22, p. 28).

#### 4. The Subsidiaries Played "Distinct Roles"

Plaintiff points to several places where it alleged conduct unique to the subsidiary Defendants. (Doc. No. 22, p. 30–31). Plaintiff also cites *Williams v. Ford Motor Co.*, 11 F.Supp.2d 983 (N.D.Ill.1998) in support of its association-in-fact allegations. *Id.* at p. 31.

#### D. Analysis

#### 1. Racketeering Activity

#### a. Intent to Deceive

■ In *Coffel v. Stryker Corp.*, the court explained, "[s]ince intent to defraud is generally not susceptible to direct proof, it usually must be proven by circumstantial evidence." 284 F.3d 625, 634 (5th Cir. 2002). Rule 9 of the Federal Rules of Civil Procedure requires that the circumstances constituting wire and mail fraud be stated with particularity. However, Rule 9 should be read together with Rule 8, which requires only a "short and plain statement

of the claim showing that the pleader is entitled to relief." *Landry v. Air Line Pilots Ass'n Int'l, AFL–CIO,* 901 F.2d 404, 430 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

For these reasons, the Court cannot say Plaintiff has failed to allege any set of circumstances that Defendant held an intent to deceive at the initiation of the interconnection agreement. Moreover, at the motion to dismiss stage, Plaintiff has not yet had an opportunity adduce evidence, direct or circumstantial, of intent to defraud on the part of Defendant.

#### b. Reasonable Reliance

The "by reason of" language of RICO has been interpreted by the Supreme Court and to require a showing that the fraud was the "but for" cause and "proximate" cause of the injury. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). "For a misrepresentation to cause an injury, there must be reliance. Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the 'but for' cause of the damages." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 218–19 (5th Cir. 2003).

Plaintiff presents a highly persuasive argument:

> Raising questions regarding representations in some invoices is hardly synonymous with actual knowledge of fraudulent statements in those invoices, much less with other invoices as to which Z–Tel had no knowledge of falsity at the time they were paid.

(Doc. No. 22, p. 26).

Moreover, objections were lodged only as to some fraction of the total number of bills and invoices. Plaintiff has raised a credible allegation that the condition of falsity was (arguably) present as to some of the other bills. Viewed in the light most favorable to the non-movant, the fact that no objection was raised demonstrates that this falsity was unknown to Plaintiff. For these reasons, the Court cannot agree with Defendant that Plaintiff has raised no allegation of reasonable reliance as to at least some critical mass of the bills at issue.

#### c. Acquisition or Maintenance

The RICO statute reads as follows:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Defendant first argues that Plaintiff fails to allege that it acquired its subsidiaries by virtue of the alleged RICO violations. Plaintiff does not seem to particularly resist this argument. Since the subsidiaries were acquired before Plaintiff began to operate as a company, Plaintiff's "acquisition" argument is lacking. Were "acquisition" a necessary condition to a RICO claim, this would likely be the end of the story. However, in the section of the statute quoted immediately above, the words "acquire" and "maintain" are separated by the disjunctive word "or."

Defendant states, "[W]hile the complaint does contain a conclusory assertion that the alleged RICO scheme helped SBC 'enhance or protect the value' of its subsidiaries, it does not assert that the alleged scheme allowed SBC to *maintain* ownership of its subsidiaries." (Doc. No. 7, p. 29–30) (italics in original). Plaintiff's maintenance allegation is contained in paragraph 124 of its complaint. In *Office Outfitters v. A.B. Dick Co.,* this Court explained:

560

Plaintiffs allege that GEC and GEC, Inc.—the RICO persons—took steps that enhanced or protected A.B. Dick's cash-in value and that such measures were injurious to Plaintiffs. Such an allegation is sufficient under § 1962(b). 83 F.Supp.2d 772, 779 (E.D.Tex.2000).

Plaintiff's theory is that Defendant's conduct allowed it to arrogate illegal profits it would not otherwise have been able to capture. The discounted value of illicit profits is reflected in shareholder equity to the same extent as are legitimate profits. Insofar as Defendant's alleged conduct was accretive to the value of these business firms, it cannot be said that the alleged RICO-violating conduct fails the maintenance requirement.

### d. Maintenance Injury

Defendant argues that Plaintiff has not alleged an acquisition or maintenance injury separate from the injuries resulting from the predicate acts. (Doc. No. 7, p. 30–31). Defendant's argument is unavailing. A complaint does not need to make a large number of allegations relating to the injury suffered. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (*quoting Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). In *Nat'l Org. for Women v. Scheidler*, the Supreme Court reversed a decision by the lower court to dismiss a complaint for lack of standing to bring a RICO action. In doing so, the Supreme Court indicated that relatively few allegations are needed to state an injury under RICO:
> [Plaintiffs] alleged in their complaint that respondents conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere. [Plaintiffs] claimed that this conspiracy 'has injured the business and/or property interests of the [plaintiffs].' In addition, [plaintiffs] claimed that [a defendant] threatened [its] clinic administrator with reprisals if she refused to quit her job at the clinic .... Nothing more is needed to confer standing on [plaintiffs] at the pleading stage.

510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

For these reasons, the Court also rejects Defendant's argument that Plaintiff's RICO damages are indistinct from its Tariff/Contract damages. (Doc. No. 7, p. 29). Defendant's Filed Tariff Doctrine argument will be discussed in more detail in Part XIX, *infra*. For present purposes, the Court notes that Defendant had not adduced sufficient authority for the proposition that the Filed Tariff Doctrine circumscribes a civil RICO plaintiff's damages.

### e. Conclusion

Plaintiff has alleged a cognizable claim as to racketeering activity.

### 2. The "Enterprise" Element

### a. Distinct Roles

Defendant cites *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 583 (5th Cir.1992) for the proposition that "a corporation cannot be both the enterprise and the RICO perpetrator." Defendant is correct in this statement of the law. *See also Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 123 (5th Cir.1986) ("the 'person' and the 'enterprise' must be distinct."); *see also Yellow Bus Lines, Inc. v. Local Union 639*, 280 U.S.App. D.C. 60, 883 F.2d 132, 139 (D.C.Cir.1989) ("Logic alone dictates that

one entity may not serve as the enterprise and the person associated with it because ... you cannot associate with yourself.").

However, Defendant misapplies the law to the Plaintiff's allegations. Plaintiff does not allege that Defendant SBC is both the enterprise and the RICO perpetrator. To the contrary, under the title, "SBC's Subsidiaries Assume A Distinct Role in Facilitating And Masking Defendants' Fraud, Plaintiff alleges that, for at least some part of the allegedly illicit conduct, the subsidiary Defendants are the perpetrators." (Doc. No. 1, p. 45 (detailing distinct roles attributable to the subsidiaries)).

Both sides direct the Court to its order in *Office Outfitters v. A.B. Dick Co.* In that case, this Court explained, "[p]laintiffs allege that A.B. Dick was used to make 'most of the misrepresentations and fraudulent omissions toward distributors....' Such an allegation is sufficient to withstand a motion to dismiss." 83 F.Supp.2d, at 780. For obvious reasons, Plaintiff feels that *Office Outfitters* is strongly correlative to the facts in the case at bar, while Defendant feels that the present set of facts are highly distinguishable.

In support of its argument, Defendant directs the Court to a recent opinion by Judge Posner, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP,* 329 F.3d 923 (7th Cir.2003). The Seventh Circuit explained:

A parent and its wholly owned subsidiaries no more have sufficient distinctness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act, *see Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its

unlawful activity, which has not been shown here.

*Id.* at 934.

The Court's first observation about *Bucklew* is that the plaintiff charged copyright infringement, fraud, conversion, and violation of RICO. The district judge dismissed all but the copyright claim, which was tried to a jury, resulting in a verdict for $660,000, which the judge remitted to $395,000. Even though the Circuit's review was *de novo* as to the pre-trial dismissal, the appellate court obviously had the benefit of a trial record to inform the totality of its analysis.

Second, *Bucklew* clearly holds out a flag for Plaintiff to capture, "unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity...". In the case at bar, Plaintiff does in fact make such an allegation. "SBC's subsidiaries' actions are all aimed at concealing, masking, and facilitating the Defendants' fraudulent scheme." (Doc. No. 1, p. 45). The Court hastens to add that it passes no judgment as to the ultimate truth of this allegation. Nor does the Court foreclose the possibility that credible summary judgment evidence may not provide sufficient factual support. However, at the motion to dismiss stage, Plaintiff's allegation is sufficient to come within the ambit of *Bucklew*'s exception.

#### b. Association–in–Fact

Defendant directs the Court's attention to an Eighth Circuit case, *Fogie v. THORN Americas, Inc.,* 190 F.3d 889 (8th Cir.1999) in which the court found a lack of sufficient distinction between the parents and subsidiary to warrant RICO liability. The Court's first observation is that, in *Fogie,* the Eighth Circuit was presented with a district court's order on a motion for summary judgment. In the case at

bar, this Court is presented with a motion to dismiss.

The Court's second observation about *Fogie* is that the holding was not as broad as Defendant asserts.

> But we must consider whether a subsidiary may be sufficiently distinct from its parent or other related subsidiaries so as to satisfy § 1962(c)'s distinctiveness requirement. We believe it cannot. A parent company and a subsidiary are separate legal entities, but this is not enough. Nor is it enough that the parent and subsidiary corporations have different roles in the alleged enterprise, as would be typical of every parent-subsidiary relationship. Rather, there must be a greater showing that the parent and subsidiary are distinct than the mere fact that they are separate legal entities. To conclude otherwise would be to read the distinctiveness requirement out of RICO.
>
> Turning our attention to the present case, the plaintiffs have not shown sufficient distinctiveness between THORN Americas; TEMINAH; THORN EMI, plc; or any of the other related business entities that allegedly comprise the RAC enterprise. All these entities are part of one corporate family operating under common control. Therefore, we affirm the District Court's granting of summary judgment to the defendants on the plaintiffs' § 1962(c) claim.

*Id.* at 898.

In response, Plaintiff points out that *Fogie* is not a Fifth Circuit case. Plaintiff also indicates that it "has not located a single case in this circuit precluding a finding of distinctiveness under 1962(c), where a subsidiary is identified as the RICO person, with an association-in-fact enterprise existing among the subsidiary and its parent." (Doc. No. 22, p. 31).

One such case is *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438 (5th Cir.

1987). In *Atkinson,* the plaintiffs appealed the district court's decision to grant the defendant's motion for judgment notwithstanding the verdict regarding a RICO claim. Discussing the concept of distinctiveness, the Court explained:

> The record here contains no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank. Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud—the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank There is no evidence of any other activity on the part of the alleged enterprise.
>
> In addition, there was no evidence presented that the five associates functioned as a continuing unit or formed an ongoing association. No connection was shown between the three individuals and the holding company. The only fact implicating the holding company in the alleged association was its purchase of shares of plaintiffs' notes from the bank. Reasonable jurors could not have found the existence of an enterprise separate and apart from the bank. The district court correctly set aside the jury's finding of a RICO violation.

*Id.* at 440.

The bottom line is that Plaintiff has its work cut out if it seeks to distinguish its case from the doctrine overviewed immediately above. However, the doctrine instructs the Court to be hesitant to cut off RICO plaintiffs before they have an opportunity to adduce "enterprise" evidence.

## E. Conclusion

In Defendant's view, a simple contract dispute may not be elevated into a RICO violation. This is certainly a correct statement of the law. However, on a motion to dismiss, the Court is required to view all allegations in the light most favorable to the non-movant. In that light, Plaintiff has alleged a pattern of intentional wrongful conduct on the part of Defendant to misuse its network and submit false business material in such a way as to seriously hamper Plaintiff's ability to compete in the market. The Court hastens to add that it passes no judgment on the ultimate truth of these allegations.

Defendant would have the Court view Plaintiff's allegations in the light most favorable to Defendant. In that light, this is "simply a contract dispute." However, the Court concludes that, when the allegations are viewed in the light most favorable to Plaintiff, Plaintiff has alleged that Defendant breached its contract by way of conduct far more deleterious than that constituting the breach itself.

For these reasons, Defendant's Motion to Dismiss Plaintiff's RICO claim (Count No. 6) is **DENIED**.

## XIX. FILED TARIFF DOCTRINE

### A. Introduction

Defendant advances a separate argument in support of its motion to dismiss 1) the RICO claim (Count 6) and 2) the Telecommunications Act claims (Count Nos. 8, 9, 10, and 11). As an initial matter, the Court notes that the relationship between the Filed Tariff Doctrine and Plaintiff's RICO claim was discussed more fully in Part XVIII, D.1.d, *supra*. At that point, the Court explained why the Filed Tariff Doctrine argument was found to be unavailing with respect to the RICO claim. The analysis to follow is particularly, though not exclusively, directed to the Telecommunication Act claims.

### B. Legal Standards

Section 203(a) of the Telecommunications Act requires local exchange carriers to file with the FCC tariffs "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Under the filed rate doctrine, "once a carrier's rate is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir.2000) (citation omitted). "The filed rate doctrine precludes the plaintiff in an antitrust suit from claiming speculative damages .... [involving] a hypothetical lower rate that would have been charged in the absence of the [anticompetitive conduct] and the acceptability of those rates to the appropriate regulatory agency." *County of Stanislaus v. Pacific Gas & Elec. Co.*, 1996-1 Trade Cases P 71305, 1995 WL 819150, *4, 1995 U.S. Dist. LEXIS 21411, *10 (*citing Keogh v. Chicago & N. W. R. Co.*, 260 U.S. 156, 164, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). However, the filed rate doctrine does not apply to cases not involving rates or rate setting. *See Central Office Telephone, Inc. v. AT & T*, 108 F.3d 981 (9th Cir.1997) (holding that the filed rate doctrine is inapplicable in a breach of contract dispute); *Columbia Steel Casting Co. v. Portland General Elec. Co.*, 103 F.3d 1446 (9th Cir.1996).

### C. Analysis

At one point, Defendant appears to seek to extend its Filed Tariff Doctrine argument to Plaintiff's entire complaint, "[t]hese allegations—and all of the causes of action that depend on them—thus implicate the expertise of the expert state commissions no less than Z–Tel's breach of contract claim." (Doc. No. 7, p. 24). How-

ever, the section heading under which the Filed Tariff Doctrine argument appears indicates that the propositions contained therein are directed solely at the RICO claim and Telecommunications Act claims. (Doc. No 7, p. 22).

Defendant's Filed Tariff Doctrine argument is primarily directed at the Telecommunications Act claims. Since the Telecommunications Act claims were dismissed on narrower grounds, the Court does not reach the Filed Tariff Doctrine argument as to these claims. However, should Plaintiff choose to replead the Telecommunications Act claims in such as way as to correct the indicated errors, Defendant is free to advance this argument again on a future dispositive motion.

## XX. LANHAM ACT

### A. Plaintiff's Complaint

 SBC, in connection with its provision of basic local and enhanced services, caused to be used in interstate commerce false and misleading descriptions or misleading representations of fact. The false and misleading descriptions or misleading representations of fact, in commercial promotion, misrepresented the nature, characteristics, and qualities of Z–Tel's services, in violation of 15 U.S.C. § 1125(a). In particular, SBC has misrepresented the nature, characteristics, and qualities of both SBC's and Z–Tel's basic local and enhanced services. For example, by providing line loss information to itself before providing it to Z–Tel and by falsely and fraudulently billing Z–Tel on a regular basis, SBC creates a false impression of the nature, characteristics, and qualities of the customer service Z–Tel provides, which it uses as the basis for its false and misleading descriptions or misleading representations of fact in commercial advertising or promotion.

In addition, SBC has run advertisements on television that refers to competing carriers as Z–Tel such as 'parasites' who 'give nothing back' and who 'invest nothing in the networks.' Other advertisements state that SBC is 'real phone company,' implying that competing carriers are not, and calling competing carriers 'middlemen.' Further advertisements accuse competing carriers of 'go[ing] for short term profits at the expense of what's good for their customers' and making 'flashy moves for Wall Street" as compared to SBC 'mak[ing] multi-year, multi-billion dollar commitments to develop new technologies for Main Street.' All of these statements constitute false or misleading statements or misleading representations of fact in commercial advertising or promotion.

(Doc. No. 1, p. 46–47).

### B. Defendant's Argument

Defendants advances three (3) arguments. First, the alleged provision of faulty line loss information and fraudulent billing fails to identify false or misleading statements of fact about a product in the context of commercial advertising or promotion. (Doc. No. 7, p. 34). Second, the allegations concerning "parasites" and "middlemen" are statement of opinion rather than fact. Third, even if the first two arguments are found to be unavailing, Plaintiff's allegation of influence on consumer purchasing decisions is a legally insufficient allegation of fact for purposes of a motion to dismiss. (*Id.* p. 35.)

### C. Analysis

#### 1. Defendant's First Argument is Unavailing

#### a. *Seven–Up* is Not Well Tailored to Defendant's Argument

Defendant cites *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379 (5th Cir.1996) for

the proposition that only those statements made in the context of commercial advertising or promotion come within the ambit of the Lanham Act. As an initial matter, the Court notes that *Seven–Up* is not a terribly good fit for Defendant's argument. In that case, the court took a fairly broad view of these terms:

Courts have noted that we should give the terms 'advertising' and 'promotion' their 'plain and ordinary meanings.' *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*, 820 F.Supp. 1072, 1077 (N.D.Ill.1993); *see also Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 236 (2d Cir. 1974) ('Notwithstanding that § 43(a) applies to a broad range of misrepresentations, it does not have boundless application ... but is limited to false advertising as that term is generally understood.') (internal quotation marks omitted). The courts are also in agreement, however, that "the Act's reach is broader than merely the classic advertising campaign." *Gordon & Breach*, 859 F.Supp. at 1534 (citing cases). In *Gordon & Breach*, the court summed up the principles found in the case law and the Act's legislative history as follows:

In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classical advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

We find this summary of the requirements for establishing 'commercial advertising or promotion' under § 43(a) of the Lanham Act to be both accurate and sound.

86 F.3d, at 1384 (citation omitted).

### b. Defendant Ignores Plaintiff's Second Paragraph

Second, Defendant's first argument ignores the second of the two paragraphs of Plaintiff's Lanham Act complaint (quoted above). In the second paragraph, Plaintiff alleges conventional advertising coming within the ambit of the definition enunciated in *Seven–Up*. The two paragraphs are not unrelated. In the final sentence of the first paragraph, Plaintiff identifies the context in which the second paragraph is to be read.

SBC creates a false impression of the nature, characteristics, and qualities of the customer service Z–Tel provides, **which it uses as the basis** for its false and misleading descriptions or misleading representations of fact in commercial advertising or promotion.

(Doc. No. 1, p. 47) (emphasis added).

### 2. Defendant's Second Argument: Statements of Fact Versus Statements of Opinion

#### a. Legal Standards

The viability of any claim under section 43(a) of the Lanham Act is a determination of whether the challenged statement is one of fact—actionable under section 43(a)—or one of general opinion—not actionable under section 43(a). Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability. *See Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 685 (5th Cir.1986). The statements at issue must be a "specific and measurable claim, capable of being proved false or of

being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999). In *Presidio*, the court explained: "[A] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." 784 F.2d at 679.

### b. Plaintiff Sufficiently Alleges Facts Capable of Empirical Verification

Plaintiff alleges that Defendant had advertised that Plaintiff "give[s] nothing back" and "invest[s] nothing in the networks." Plaintiff's investment in its network, or at least the facilities it has erected on Defendant's network, is certainly capable of empirical verification. The Court assumes that such verification would examine Plaintiff's investment vis-a-vis that of similarly situated telecommunications companies. Similarly, Plaintiff's support for community causes (to take one possible hypothetical) could be offered as empirical support that it fails to "give nothing back."

### c. Conclusion

For these reasons, Defendant's second argument is unavailing.

### 3. Defendant's Third Argument: Impact on Purchasing Decisions

### a. Legal Standards

Plaintiff seeks actual damages. In *Pizza Hut v. Papa John's Int'l*, the court explained:

Plaintiffs looking to recover monetary damages for false or misleading advertising that is not literally false must prove actual deception. *See Balance Dynamics Corp. v. Schmitt Ind.*, 204 F.3d 683, 690 (6th Cir.2000); *Resource Developers*, 926 F.2d at 139. Plaintiffs attempting to prove actual deception have to produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements. *See, e.g., PPX Enters., Inc. v. Autofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir.1987) ('Actual consumer confusion often is demonstrated through the use of direct evidence, e.g., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests.').

227 F.3d 489, 497 (5th Cir.2000).

### b. Analysis

The Court cannot usefully require Plaintiff to adduce evidence of actual consumer confusion, and yet not allow Plaintiff the opportunity to obtain evidence of actual consumer confusion. In any event, Plaintiff's allegations of being called a "parasite" who seeks only "short term profits" are the type of allegations which would tend to wrongfully and negatively shift inward the demand curve Plaintiff faces in the marketplace.

### c. Conclusion

For these reasons, Defendant's third argument is unavailing.

### D. Conclusion

Defendant's Motion to Dismiss Plaintiff' Lanham Act claim (Count No. 7) is **DENIED**.

## XXI. CONCLUSION

Defendant's motion is **GRANTED** as to A) Plaintiff's Essential Facilities claim (Count No. 2), B) Breach of Contract claim (Count No. 11), and C) Telecommunica-

tions Act claims (Count Nos. 8, 9, and 10). Plaintiff's Essential Facilities Claim is **DISMISSED with prejudice**. By contrast, Plaintiff's "Breach of Contract" and Telecommunications Act claims are **DISMISSED without prejudice to repleading**.

The Court draws special attention to the Tying claim. (Count No. 5). As explained in Part XIII, E.4, *supra*, Defendant's motion is denied as to the Tying claim with a tying market defined as DSL service. Through its use of the disjunctive word "alternatively" Plaintiff's Complaint indicates that an alternative market for broadband internet access need not be considered. So as to avoid any confusion, Plaintiff's Tying claim involving a tying market for broadband internet access is **DISMISSED without prejudice to repleading**.

If Plaintiff chooses to replead any of the claims which are being dismissed without prejudice, it shall do so within thirty (30) days of the entry of this Order.

On all other claims, Defendant's motion is **DENIED**. Defendant urges dismissal of the state law claims if the federal causes of action fail. Not all of the federal causes of action having been found to fail, the state law claims receive no discussion in the Court's analysis.